**Joseph E. NANCE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 10360.**

District of Columbia Court of Appeals.

Submitted Sept. 15, 1976.

Decided Aug. 2, 1977.

---

Linda J. Ravdin, Arlington, Va., appointed by this court, for appellant.

Earl J. Silbert, U. S. Atty., John A. Terry, Barry L. Leibowitz, and Richard H. Saltsman, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee.

Before KERN, YEAGLEY and HARRIS, Associate Judges.

KERN, Associate Judge:

Appellant was convicted of carrying a pistol without a license[1] after a trial upon stipulated facts which were developed at the pretrial hearing on his motion to suppress the pistol. Appellant challenges the trial judge's denial of his suppression motion; he argues that the police lacked probable cause to arrest him, thereby invalidating the subsequent search which revealed the pistol concealed on his person.

At the suppression hearing the prosecution elicited the following testimony from Sergeant Ware, one of the arresting officers:

Q. Would you tell us the circumstances that Mr. Nance first came to your attention that day and what procedure you or any other officers followed?

A. Myself and another officer was [sic] in the Vice Unit at [501] New York Avenue. We received information from a reliable source and this source stated that subject described—he described the subject, the car the subject was next to was selling bam[2] in front of Wings and Things in the 1900 block of 14th Street, Northwest.

. . . . .

Q. Would you tell us what description was given?

A. The subject stated—the subject was Negro male wearing a fake fur coat, two-tone grey blue pants and standing next to a white Lincoln Continental.

. . . . .

Q. What did you do after you received the information?

A. I responded to the vicinity of 1900 block of 14th Street, Northwest and when we approached the block we observed a white Continental on the west side of the 1900 block of 14th Street.

. . . . .

Q. Did you see anyone around the vehicle?

A. Yes, sir.

Q. Did any of those persons meet the description given to you?

A. Yes, sir.

Q. Could you tell us how they met the description?

A. Mr. Nance was wearing a fake fur coat, two-tone. He was wearing blue pants and he was a Negro male.

. . . . .

Q. And what, if anything, occurred at that point as the three of you arrived on the scene?

A. *Detective Golf [sic] approached Mr. Nance, identified himself and stated to Mr. Nance that he had information that he was selling bam. Detective Goff reached into Mr. Nance's coat pocket and removed a vile [sic] containing pink pills*

. . . . .

---

1. D.C. Code 1973, § 22–3204.

2. The government indicates that "[a]lthough not explained in the record, all of the parties seemed to recognize 'bam' as the street name for the drug phenmetrazine, which also goes by the trade name of Preludin." (Appellee's Brief at 2 n.3.)

Q. After Mr. Nance was arrested what, if anything, did you or any of the other officers do with him?

A. He was placed in the back of the cruiser, handcuffed and transported to the Third District Vice Unit.

. . . . .

Q. Did anything occur while you were riding to the station? If so, tell us what happened?

A. Yes, In the 600 block of New York Avenue Mr. Nance asked me to look inside his coat. I asked him what for. He said just look inside my coat. I reached under neath [sic] his coat and from up an upside down shoulder holster I recovered the gun. [Record at 3–7; emphasis added.]

The prosecutor then examined his other witness, Detective Goff, who was another member of the arresting party, as follows:

Q. Could you tell us where you first saw Mr. Nance and what procedure you followed that led up to his arrest?

A. Yes, sir. The first time I ever saw Mr. Nance he was in the 1900 block of 14th Street on the west side of the street standing next to—along side a 1965—if I am correct, it was a '65 white Lincoln Continental. This was on January 18, approximately 10:55 in the evening.

*We received information that Mr. Nance was at that location with narcotics—selling narcotics.* We were given a description. He fit the description. He was the only subject that really fit the description.

I approached him and identified myself and removed from his right coat pocket one vile [sic] containing thirteen preludent [sic] tablets in a vile [sic] with a prescription in his name.

Q. O.K. At that time did you place him under arrest?

A. Yes, sir. I did. [Record at 21; emphasis added.]

 It may be seen that the arrest of appellant resulting in the seizure of the pistol, the possession of which is the basis

for his conviction,[3] rested *solely* upon an informant's tip. Sergeant Ware and Detective Goff, prior to arresting appellant, observed him do nothing even suspicious, much less criminal. Accordingly, we must determine whether the government complied with the Supreme Court's mandate in *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964), that when the police rely on an informant's tip as the factor to establish probable cause to make an arrest, the government must provide the judicial officer who subsequently passes upon the arrest's validity with "some of the underlying circumstances from which the informant concluded" a crime was being committed and "some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable.'" *Aguilar*, in sum, calls for the judicial officer to employ a two-pronged test in assessing the probative value of an informant's tip: first, he must evaluate the veracity of the informant to decide whether to credit the tip; and, second, he must determine the basis of the informant's knowledge to decide what weight to give the tip.

The reason, of course, the prosecutor must always present the circumstances surrounding the informant's tip is that the Supreme Court has declared that the judicial officer "must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause," *Giordenello v. United States*, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958); that "recital of some of the underlying circumstances . . . is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police," *Ventresca v. United States*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); and, that these are "important safeguards [which] assure that the judgment of a disinterested judicial officer will interpose itself between the police and the citizenry," *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969).

**3.** No prosecution for possession of narcotics was undertaken so far as the record shows.

The government's direct testimony at the suppression hearing, as quoted above, failed to reveal to the court, however, any circumstances at all underlying either (1) the informant's conclusion, which he passed on in his tip, that appellant "was selling bam," or (2) Sergeant Ware's conclusion that the unidentified informant was generally "credible" or that his tip on this particular occasion was "reliable." Indeed, the government appeared not to realize the need for its evidence to meet *Aguilar's* two-pronged test. Thus, the prosecutor stated in his argument on the suppression motion (Record at 33):

> I didn't realize she [defense counsel] was going to argue this point as to whether or not the informant indicated he had observed the transaction or had received the information secondhand which I didn't realize was going to be an issue. [Emphasis added.]

We turn first to determining whether *Aguilar's* basis of knowledge prong was met. We have noted Sergeant Ware testified only that the informant said appellant "was selling bam" and Detective Goff testified merely "we received information that Mr. Nance was at that location . . . selling narcotics." The government's case is quite inadequate when compared with its showing in prior informant cases before this court. *See Smith v. United States*, D.C. App., 348 A.2d 891 (1975) (informant stated in his telephone call to the police he had watched appellant selling tin foil packets from a cigarette package); *United States v. Malcolm*, D.C.App., 331 A.2d 329 (1975) (police instructed informant to make "further observations" after receiving his report that drug transactions had taken place at a certain location; informant returned and said a drug sale was "in progress"); and *Banks v. United States*, D.C.App., 305 A.2d 256 (1973) (informant stated to police that he "personally knew" his information was true; the source of the personal knowledge was verified by in camera proceedings). In all those cases the government's evidence directly established that the informant's allegation that the defendant was engaged in criminal activity was based on firsthand knowledge; hence the prosecution there, in contrast to the instant case, clearly satisfied *Aguilar's* basis of knowledge prong.

According to the Supreme Court in *Spinelli, supra*, however, failure to present such evidence will not preclude a trial judge from finding that the informant's basis of knowledge was adequate. The Court suggested that "[i]n the absence of a statement detailing the manner in which the information [contained in the tip] was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know [the informant] is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Id.* at 416, 89 S.Ct. at 589.

Mr. Justice White in his concurring opinion stated that "there are limited special circumstances in which an 'honest' informant's report, if sufficiently detailed, will in effect verify itself—that is, the magistrate when confronted with such detail could reasonably infer that the informant had gained his information in a reliable way. . . . Detailed information may sometimes imply that the informant himself has observed the facts." *Id.* at 425, 89 S.Ct. at 593.

■ *Spinelli's* supplementation of *Aguilar's* test poses the question then in the instant case whether the tip to Sergeant Ware so detailed the accused's criminal activity that it was reasonable for the court to conclude that the informant himself saw appellant selling "bam." The tip's only details were contained in a description of appellant: "a Negro male wearing a fake fur coat, two tone grey, blue pants and standing next to a white Lincoln Continental." While such details would permit an inference that the informant had observed what appellant was wearing, it is not sufficient to support the further inference that the informant's allegation of criminal conduct on the part of appellant was based on something "more substantial than a casual rumor . . . or an individual's general

reputation." Thus, the government failed to satisfy *Aguilar's* basis of knowledge prong. *Compare Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (informant not only described Draper but detailed where he was going and why, the method of transportation, and predicted when he would return and what he would be wearing); *Soles v. State,* 16 Md.App. 656, 299 A.2d 502 (1973), *cert. denied,* 415 U.S. 950, 94 S.Ct. 1473, 39 L.Ed.2d 566 (1974) (informant not only described Soles and his automobile, but also detailed the cocaine operation).

With respect to *Aguilar's* requirement of satisfying the so-called veracity prong, the government presented in its case no circumstances at all underlying the officers' conclusion that the informant was telling the truth when he alleged appellant "was selling bam." However, defense counsel cross-examined Sergeant Ware as follows:

Q. How long have you known the informant?

A. I would say about three, four weeks prior to that time.

. . . . .

Q. How many times have you received information from the informant?

A. At that time, five previous times.

Q. Is the informant paid for providing information?

A. No ma'am.

Q. Has the informant ever given you any information which has not been reliable [*sic*]?

A. No ma'am.

. . . . .

THE COURT: . . . Did you promise him anything about dropping charges?

A. I told him we would talk to the U.S. Attorney.

. . . . .

[DEFENSE COUNSEL] About dropping a charge or more than one charge?

A. About the case pending in court, yes, ma'am.

. . . . .

Q. Is the person [the informant] charged with a misdemeanor or felony?

THE WITNESS: It's a misdemeanor.

[DEFENSE COUNSEL]: So, Your Honor, now that I have had answers to those questions may I ask if the informant is a narcotic adict [*sic*]?

. . . . .

THE WITNESS: I believe he is. [Record at 9–13.]

The government argues that the informant's veracity is established by Officer Ware's testimony that he had received information on five prior occasions from the informant and he had *not* been given any *unreliable* information on these occasions. However, the officer supplied no details at all as to these tips. The Supreme Court has concluded that a "bare statement by an [officer] that he believed the informant to be truthful" does *not,* in and of itself, provide a factual basis for the judicial officer to credit the report of an unnamed informant, *United States v. Harris,* 403 U.S. 573, 579, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971); and, that a sworn statement that an informant was "reliable," *without any reason in support of such conclusion,* was inadequate to show probable cause, *Spinelli v. United States, supra* at 413, 89 S.Ct. 584. Judge Charles E. Moylan, Jr.[4] has suggested that "If the phrase 'a reliable informant' is too conclusory, as it is, then the clause 'an informant who has been found by me to be reliable in the past' is no less conclusory, but simply wordier. If 'reliable' is switched to 'credible' or 'prudent', the use of any adjective is still the lawman's characterization and not the facts from which the magistrate can do his own characterizing." Moylan, *Hearsay and Probable Cause: An Aguilar and Spinelli Primer,* 25 Mercer L.Rev. 741, 758 (1974). Whether the government can establish the veracity of the informant merely by asserting he had passed on information in the past that had not been unreliable without further detail is

---

4. Judge Moylan is an Associate Judge of the Maryland Court of Special Appeals.

open to question. *Cf. Mitchell v. United States*, D.C.App., 368 A.2d 514, 516 n. 3 (1977). However, there is further evidence concerning the informant's truthfulness on this particular occasion. Thus, we note from the testimony in the record that a criminal case was then pending against the informant and further that Sergeant Ware promised to "talk to the U.S. Attorney about it." This would seem to provide an incentive for the informant to tell the truth to the officer on this particular occasion and could be given weight by the judicial officer in evaluating the reliability of the tip. *See United States v. Carter*, 162 U.S.App.D.C. 132, 134, 498 F.2d 83, 85 (1974).

However, we caution that a basic skepticism about the truthfulness of this kind of informant is warranted:

> The typical paid or protected police informant—drawn from the criminal milieu—is almost universally viewed with a jaundiced eye. He is inherently suspect. He hides behind a cloak of anonymity. His information—just as the testimony of an accomplice—is looked upon with a healthy skepticism and is examined with great scrutiny. [Moylan, *supra* at 769.]

■ Moreover, it seems a paradox for the judicial officer to conclude that the informant is a "truth-teller" solely upon the basis of his status as a criminal defendant in a pending case when that very status also renders him inherently suspect. Yet the more severe the charge and the more definite and substantial the promise of leniency by the police, the more reliable the tip would become. Again, it is the government's burden to show any such circumstances which would demonstrate the reliability of an informant's tip.[5]

5. We recognize the tension between (a) the government's burden of showing sufficient details about the informant and his relationship with the police that the court can independently determine the truthfulness of the tip, and (b) the government's legitimate interest in protecting the identity of professional informers, *see McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). We share Justice Harlan's view, however, that:

> *Without violating the confidences of his source*, the agent surely could describe for the magistrate such things as the informer's

■ The government also relies here on the fact that the police, prior to effecting appellant's arrest, did confirm by their own observation the innocent parts of the informant's tip, *viz.*, appellant's dress and location. Arguably, then, if his tip was true in part, it may be inferred it was true in whole. We note, however, that courts and commentators have rejected the proposition that police investigation which substantiates only *innocuous* aspects of a tip will suffice to establish that the informant was telling the truth about the remaining critical part, *i. e.*, the allegation of criminal conduct. *United States v. Jackson*, 533 F.2d 314, 318 (6th Cir. 1976); *United States v. Jordon*, 530 F.2d 722, 726 (6th Cir. 1976); *United States v. Spach*, 518 F.2d 866, 870–71 (7th Cir. 1975); *United States v. Larkin*, 510 F.2d 13, 15 (9th Cir. 1974); *Comment, Informer's Word as the Basis for Probable Cause in the Federal Courts*, 53 Calif.L.Rev. 840, 843 n. 22 (1965); *Note, Probable Cause and the First-Time Informer*, 43 Colo.L.Rev. 357, 362–63 (1972); *Note, The Informer's Tip as Probable Cause for Search or Arrest*, 54 Cornell L.Rev. 958, 966–68 (1969). Of course, such verification by the police of wholly innocent parts of the tip is relevant to the ultimate question of the informant's veracity because it indicates that the tip was not a *complete* fabrication. But we are doubtful that if the police confirm by their own observation that an informant has truthfully described an individual standing on a public street it is any more likely that he is also telling the truth about whatever crime he may accuse that individual of committing. As Justice White, concurring in *Spinelli, supra* stated:

> general background, employment, personal attributes that enable him to observe and relate accurately, position in the community, reputation with others, personal connection with the suspect, any circumstances which suggest the probable absence of any motivation to falsify, the apparent motivation for supplying the information, the presence or absence of a criminal record or association with known criminals, and the like. [*United States v. Harris*, 403 U.S. 573, 600, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (Harlan, J., dissenting) (emphasis added).]

[It would not] suffice, I suppose, if a reliable informant states there is gambling equipment in Apartment 607 and then proceeds to describe in detail Apartment 201, a description which is verified before applying for the warrant. He was right about 201, but that hardly makes him more believable about the equipment in 607. But what if he states that there are narcotics locked in a safe in Apartment 300, which is described in detail, *and the apartment manager verifies everything but the contents of the safe?* I doubt that the report about the narcotics is made appreciably more believable by the verification. [393 U.S. at 427, 89 S.Ct. at 594; emphasis added.]

In sum, the evidence before the trial judge on the question of the informant's veracity consisted of the officer's assertion, without more, that he had been reliable on prior tips, a promise to the informant by the officer to "talk" to the U.S. Attorney handling the informant's pending misdemeanor charge, and the corroboration by the police themselves of certain parts of the tip wholly innocent in nature. The trial judge evidently found that evidence sufficient to satisfy this prong of *Aguilar's* test because he concluded the informant was reliable. In our view, the question is very close only because the government failed to elicit from its witnesses sufficient facts and circumstances. We see no need to decide the point, however, since our holding is that the government failed to show the informant's basis of knowledge for his tip.

We have written at some length because of the government's apparent misconception in this case concerning the need for and nature of the prosecution's showing when probable cause can be established only by an informant's tip. We assume that had the government been fully cognizant of its responsibility under the Supreme Court's mandate in *Aguilar*, as explained in *Spinelli*, it could and would have elicited the necessary facts and circumstances here with but a question or two more of its witnesses. Our duty to reverse the conviction for failure to meet the Supreme Court's mandate prompts reference to the following comment by Judge Moylan in his thoughtful article:

> Police compliance need not be difficult, if the spirit of *Nathanson-Giordenello-Johnson-Aguilar-Spinelli* [6] is once understood and appreciated. In permitting hearsay information from unnamed informants to serve as a significantly contributory, and even self-sufficient, basis for probable cause, the Constitution is realistically extending great latitude to law enforcement. When a magistrate is asked, therefore, to dispense with the oath, with personal observation, and even with the identity of the source of the ultimate information upon which he must act, it is only a realistic substitute to require that the policeman make a bona fide effort to furnish in significant detail those reasons the policeman has for believing his informant. [Moylan, *supra* at 759.]

*Reversed and remanded with directions to suppress the evidence.*

---

6. *Nathanson v. United States*, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933); *Giordenello v. United States, supra; Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Aguilar v. Texas, supra; Spinelli v. United States, supra.*