Jamie E. GOLDSTON, Appellant,

v.

UNITED STATES, Appellee.

No. 87–591.

District of Columbia Court of Appeals.

Submitted July 12, 1988.
Decided July 6, 1989.

Jensen E. Barber, Washington, D.C., appointed by this court, was on the brief, for appellant.

Timothy J. Reardon, III, Principal Asst. U.S. Atty., with whom Michael W. Farrell, Asst. U.S. Atty., at the time the brief was filed, Elizabeth Trosman, Eva Polin, and Patricia A. Riley, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN and BELSON, Associate Judges, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

Appellant was arrested and searched on a Northwest street corner, resulting in the police recovering six plastic bags of cocaine from his jacket. The trial court denied appellant's pretrial motion to suppress the drugs, whereupon appellant entered a conditional plea of guilty [1] to one count of possession of cocaine in violation of D.C. Code § 33–541(d) (1988 Repl.). Appellant now challenges the trial court's ruling, arguing that the police lacked probable cause to arrest him. We disagree and affirm.

I

On the evening of October 28, 1986, a police officer received a telephone call from an informant who, over the previous eighteen months, had provided him with accurate and reliable information on eleven occasions. The source, who had never supplied the police with inaccurate information over this lengthy period, stated that a slender, six-foot tall black male named "Jamie" regularly sold cocaine at the corner of Fuller and Mozart Streets, Northwest. The source further specified the color, make, and license tag number of a gray [2] BMW he had seen Jamie drive, and added that Jamie lived in the 400 block of Columbia Road. The informant also stated that he had purchased cocaine from Jamie at the Fuller and Mozart Street location within the previous seventy-two hours.

The next morning, a vehicle registration check of the tag number supplied by the informant showed that the BMW was registered to a person residing at 423 Columbia Road,[3] which coincided with the information related by the informant. The police consequently established a look-out post at that address where they remained for most of the day. No one fitting Jamie's description left the Columbia Road address until late in the afternoon when appellant emerged from the house. The informant, who had joined the police at the lookout, immediately identified appellant as the person from whom he had recently purchased cocaine.

Appellant entered a white Audi—not a BMW—and drove off. The police followed him as he drove directly to the intersection of Fuller and Mozart Streets, the same corner where the informant stated Jamie sold drugs daily, and parked his car. There were several people on the corner. The informant stated to the officer that they were customers waiting for appellant. When the latter finally alighted from the car he was placed under arrest and the packets of cocaine were recovered from his jacket pocket.[4]

Appellant filed a pretrial motion to suppress, arguing that the informant's information did not give the police probable cause to arrest him. The trial court denied the motion, noting that even though it was required to scrutinize the informant's veracity closely because of the latter's status as a paid police informant, any deficiency in this area was "outweighed ... by the long and significant history of productive tips and the absence of unproductive tips...." In a rather lengthy and careful ruling in which the court analyzed the material evi-

---

1. Super.Ct.Crim.R. 11(a)(2).

2. References in the record describe the car alternatively as gray or silver.

3. At the pretrial suppression hearing, the officer in charge of the investigation testified that he could not recall to whom the vehicle was registered.

4. The bags contained 8,552 mg of white powder of which 2,292 mg, or 26.8 percent, was cocaine HCl.

dence, the trial judge concluded that "taking into account all of the surrounding circumstances ... as well as [the informant's] veracity and basis of knowledge" coupled with independent police corroboration of the details related to them by the informant, the information "was sufficient under the law to provide the necessary probable cause." This appeal followed.

## II

■ Our role in reviewing a trial court's decision not to suppress evidence seized as a result of information supplied by a confidential source is to ensure that the trial court had a substantial basis for concluding probable cause existed. *See United States v. Johnson,* 540 A.2d 1090, 1091 n. 2 (D.C. 1988) (citing *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983)); *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1980). In doing so, we must accept the inferences drawn by the trial court from the facts adduced at the motions hearing if they are supported under any reasonable view of the evidence. *United States v. Rorie,* 518 A.2d 409, 410 (D.C. 1986).

At the outset, we note that the concept of probable cause is "not readily, or even usefully, reduced to a neat set of legal rules." *Gates, supra,* 462 U.S. at 232, 103 S.Ct. at 2329. As the Supreme Court has recently reiterated,

"[t]he process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same— and so are law enforcement officials."

*United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)).

Prior to 1983, cases involving informant tips were analyzed under a somewhat rigid and mechanical two-pronged analysis—the *Aguilar–Spinelli* test. *See Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The test required, *inter alia,* that the reviewing judge examine both the veracity or reliability of the informant and the informant's "basis of knowledge" for the information. *See Rutledge v. United States,* 392 A.2d 1062, 1065 & n. 4 (D.C. 1978). An inadequate showing as to one prong was usually fatal to a finding of probable cause.

■ This analytical framework has been rejected, however, as overly formalistic and cumbersome. In its place, the Supreme Court—and subsequently this court— adopted the more pragmatic *Gates* "totality of the circumstances" test.[5] *Gates* did not completely reject the *Aguilar–Spinelli* criteria; rather, the Court observed that while

"veracity," "reliability," and "basis of knowledge" are all highly relevant in determining the value of [an informant's] report[, w]e do not agree ... that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case.... Rather ... they should be understood simply as closely intertwined issues that may usefully illuminate the common-sense, practical question whether there is "probable cause"....

*Gates, supra,* 462 U.S. at 230, 103 S.Ct. at 2328 (footnote omitted); *see Allen v. United States,* 496 A.2d 1046, 1048 (D.C.1985); *Jefferson v. United States,* 476 A.2d 685, 686 (D.C.1984), *overruling in part Nance v. United States,* 377 A.2d 384 (D.C.1977).

Consequently, because the test is one requiring a balancing of several factors, if one of the relevant indicia is deficient it is not fatal to a finding of probable cause if there is a strong showing as to another, or if there exist some other indicia of reliability. *Gates, supra,* 462 U.S. at 233, 103

---

**5.** While *Gates* dealt with the probable cause required to issue a search warrant, we noted in *Stanley v. Hannon,* 402 A.2d 814, 816 (D.C.1979)

and *United States v. Davis,* 387 A.2d 1091, 1092 n. 2 (D.C.1978), that the same probable cause standards apply to a warrantless arrest.

S.Ct. at 2329. With these realistic considerations in mind, we turn to examine the facts in the case before us.

### A.

■ While a paid police informant may generally be presumed to be less credible than a citizen informant, *see Allen, supra,* 496 A.2d at 1048–49 & n. 2, here, the informant had a long and rather extraordinary history of providing the police with productive tips which outweighs that presumption, *see Jefferson, supra,* 476 A.2d at 687. A police officer who had worked with the informant for over eighteen months testified at the suppression hearing that information supplied by the informant during that period had led to eleven arrests, the seizure of drugs and numerous weapons, and an unknown number of convictions. Not only that, the officer testified that he knew of no occasion where the informant had proven to be unreliable. This long record of past productive information would reasonably establish this informant's reliability. *See Smith v. United States,* 348 A.2d 891, 892 (D.C.1975), *cf. Jefferson,* 476 A.2d at 687 (informant gave fruitful tips on nine prior occasions); *District of Columbia v. M.E.K.,* 407 A.2d 655, 656 (D.C.1979) (informant had history of supplying reliable information on six occasions); *Waldron v. United States,* 370 A.2d 1372, 1373 (D.C.1977) (officer relied on knowledge that paid informant had performed well for other officers in past).

While an informant's history of supplying prior productive information is a most important guide to establishing reliability and credibility, we have noted that other ancillary issues also come into play in that determination. These can include "employment, personal attributes favoring accuracy in observation and reporting, reputation with others, personal connection with the suspect, any circumstances suggesting probable lack of motivation to falsify, and association with known criminals." *Rutledge, supra,* 392 A.2d at 1066 n. 7. During the suppression hearing, the police officer testified that the informant was employed, that his motivation for supplying accurate information to the police was monetary remuneration, and that he was not a drug addict. These factors, on balance, lent some additional support to the informant's credibility, though not as important as the informant's reliability which had been established over a long period of time.[6]

Finally, we note one striking fact in the record which is supportive of the informant's credibility. After the police established their surveillance post on Columbia Road, they were joined by the informant who stayed with them until appellant was seen exiting the house. He then accompanied the police as they followed appellant to the corner of Fuller and Mozart Streets. Had the information the informant supplied to the police been false, it is unlikely that he would have participated in the surveillance or waited with the police for them to discover that fact.[7]

6. Although defense counsel attempted to elicit further information about the informant, the trial court sustained the government's objections to some of the questions on the grounds that they were either irrelevant or, more importantly, would tend to compromise the confidential identity of the informant. Given the government's strong legitimate interest in protecting the identity of its informants, *see McCray v. Illinois,* 386 U.S. 300, 308, 87 S.Ct. 1056, 1061, 18 L.Ed.2d 62 (1967), the fact that defense counsel failed adequately to proffer to the court why the questions were probative of bias, *see DeNeal v. United States,* 551 A.2d 1312, 1315 (D.C.1988), and the trial court's broad discretion in determining the extent of cross-examination, *see Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *Bush v. United*

*States,* 516 A.2d 186, 196 (D.C.1986), we see here no substantial issue.

For a probable cause hearing, appellant conducted quite a lengthy, searching, and sophisticated cross-examination. He was, as noted, restricted upon a few occasions, but not to an extent that deprived him in a fundamental sense.

7. Some slight additional support is lent to a determination of the informant's reliability by his admission to the police that he purchased cocaine from appellant—an admission against his penal interest. *See* D.C.Code § 33–541(d) (1988 Repl.).

Common sense in the important daily affairs to life would induce a prudent and disinterested observer to credit [this] statement[ ]. Peo-

### B.

In addition to establishing that the informant was very reliable, the government presented evidence showing that the police corroborated a number of otherwise "innocent details" he provided thus bolstering both the reliability of the information and the credibility of the informant. The Supreme Court has "consistently recognized the value of corroboration of details of an informant's tip by independent police work," *Gates, supra,* 462 U.S. at 241, 103 S.Ct. at 2333; *see, e.g., Aguilar, supra,* 378 U.S. at 109 n. 1, 84 S.Ct. at 1511 n. 1; *Jones, supra,* 362 U.S. at 269, 80 S.Ct. at 735; *accord, Jefferson, supra,* 476 A.2d at 686, because "[c]orroboration through other sources of information reduce[s] the chances of a reckless or prevaricating tale," thus providing "a substantial basis for crediting [the informant's statement.]" *Jones, supra,* 362 U.S. at 269, 80 S.Ct. at 735; *see Gates, supra,* 462 U.S. at 244, 103 S.Ct. at 2335 (quoting *Spinelli, supra,* 393 U.S. at 427, 89 S.Ct. at 594 (White, J., concurring)).

*Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), is "the classic case on the value of corroborative efforts of police officials." *Gates, supra,* 462 U.S. at 242, 103 S.Ct. at 2334. In *Draper,* a paid informant reported that an individual would arrive in Denver on a train from Chicago on one of two dates, and would be in possession of a quantity of heroin. The informant also gave a description of the individual, but gave no indication as to the basis for his information. *Draper, supra,* 358 U.S. at 309, 79 S.Ct. at 331.

On one of the stated dates police officers observed a man [—Draper—] matching [the informant's] description exit a train arriving from Chicago; his attire and luggage matched [the informant's] report and he was walking rapidly.... [B]y this point in his investigation, the arresting officer "had personally verified every facet of the information given him ... except whether [Draper] had accomplished his mission and had ... heroin on his person...."

*Gates, supra,* 462 U.S. at 242–43, 103 S.Ct. at 2334 (citation omitted).

The Court concluded that "'with every other bit of [the tip] thus personally verified, [the officer] had "reasonable grounds" to believe that the remaining unverified bit of [the informant's] information—that Draper would have the heroin with him—was likewise true.'" *Id.* (quoting *Draper, supra,* 358 U.S. at 313, 79 S.Ct. at 333). Thus, reasoned the Court, the information was sufficient to support a finding of probable cause.

We perceive no significant distinction between *Draper* and this case. Here, like in *Draper,* the police corroborated several otherwise innocent details of the informant's information. The informant told police that Jamie drove a BMW, supplied the license tag number, and stated that Jamie lived in the 400 block of Columbia Road. The police ran a computer check of the tag number and determined that it was registered to a person living at 423 Columbia Road. The police and, not incidentally, the informant, then staked out that address until appellant emerged from the house— the only person matching the informant's description to do so. They then followed appellant who drove directly to the corner of Fuller and Mozart, the intersection

---

ple do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime ... carry their own indicia of credibility—sufficient at least to support a finding of probable cause....
*United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971).

That the informant did not show or give the police the purchased drugs does not affect this determination. *See id.* Similarly, such a determination is not affected by the fact "[t]hat the informant may be paid or provided a 'break,'"

*id.* at 583–84, 91 S.Ct. at 2082 (payment or promise of leniency "does not eliminate the residual risk and opprobrium of having admitted criminal conduct"); nor by the failure to charge him for similar uncontrolled drug purchases, *see United States v. Davis,* 199 U.S.App. D.C. 95, 111, 617 F.2d 677, 692 (1979). Moreover, it appears from a brief colloquy between the prosecutor and defense counsel that the government had made no insulating promises of leniency or immunity to the informant regarding the cocaine purchase forming the basis for the tip at issue here.

where the informant said that Jamie regularly sold drugs, and parked there.[8] Finally, the police observed a group of people standing on the corner—at approximately 7:00 p.m.—whom the informant identified as appellant's customers.[9]

While none of these activities, viewed alone, necessarily gives rise to a conclusion that appellant was engaged in illegal activity, " 'in this case, just as in *Draper,* seemingly innocent activity became suspicious in light of the initial tip.' " *Gates, supra,* 462 U.S. at 243 n. 13, 103 S.Ct. at 2335 n. 13 (quoting *People v. Gates,* 85 Ill.2d 376, 390, 423 N.E.2d 887, 893, 53 Ill.Dec. 218, 224 (1981) (Moran, J., dissenting), *rev'd,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). " [I]nnocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demand[s].' " *Jefferson, supra,* 476 A.2d at 686 (quoting *Gates, supra,* 462 U.S. at 243 n. 13, 103 S.Ct. at 2335 n. 13).

In summary, the informant here had a long and significant history of providing prior reliable information. That history is supported by other indicia bolstering the informant's reliability and credibility. In addition, the police corroborated a substantial number of innocent details contained in the informant's report. This leads us to conclude that the trial court was reasonable in determining that the information relayed to the police in this case was itself reliable.

### C.

While a court examining an informant's veracity or reliability seeks to determine whether the informant relayed truthful information, an examination of the informant's "basis of knowledge" inquires into how he knew what he was relaying. Our decisions recognize that this criterion is adequately satisfied when " 'the informant's tip [is] based on personal knowledge acquired by first-hand observation.' " *See M.E.K., supra,* 407 A.2d at 657 (citation omitted).

Here, the informant gave police a general description of appellant and told police his first name. He informed them that appellant regularly sold cocaine at a particular intersection in the city, and described the make and license tag number of a car appellant had driven to that location, as well as the block he lived on. In addition, he stated that he personally purchased cocaine from appellant. These circumstances permit, at the very least, an inference that the information was based on personal observation rather than "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli, supra,* 393 U.S. at 416–17, 89 S.Ct. at 589; *see Waldron v. United States,* 370 A.2d 1372, 1373 (D.C. 1977); *cf. Jefferson, supra,* 476 A.2d at 687 (that "informant revealed in his tip ... that he had seen the subject selling narcotics" sufficient to satisfy basis of knowledge requirement); *Banks v. United States,* 305 A.2d 256 (D.C.1973) (informant stated he "personally knew" the suspect had drugs on him).[10]

---

**8.** That this "surveillance confirmed, in large measure, the [informant's] prediction of [appellant's] future conduct," *Offutt v. United States,* 534 A.2d 936, 939 (D.C.1987) (dissenting opinion) (emphasis in original) (citing *Gates, supra,* 462 U.S. at 291–93, 103 S.Ct. at 2360–61), is also supportive of the conclusion that the police had probable cause to arrest him.

**9.** We note that while the informant told police that Jamie drove a BMW, the night he was arrested he drove a white Audi. The dissent seizes on this seeming inaccuracy and suggests that it undermines the probative value of the tip.

   However, in *Gates* the Supreme Court rejected the same argument. In that case, the informant

stated that one of the defendants would fly from Florida to Illinois as part of a drug transaction, when in fact she drove. *Gates, supra,* 462 U.S. at 225–27, 103 S.Ct. at 2325–26. The majority noted, though, that

> We have never required that informants used by the police be infallible, and can see no reason to impose such a requirement in this case. Probable cause ... simply does not require the perfection the dissent finds necessary.

*Id.* at 245 n. 14, 103 S.Ct. at 2336 n. 14. This reasoning applies to the dissent here with equal force.

**10.** Even if we were to assume a deficient showing in this area, that deficiency is overcome by

## III

■ In concluding that they had probable cause to arrest appellant, the police relied on their corroboration of details of the information, coupled with the informant's unusually well-established record of supplying productive and reliable information as well as his personal basis of knowledge. We think that this information, on the whole, "suffic[ed] for the practical, common-sense judgment called for in making a probable cause determination." *Gates, supra,* 462 U.S. at 244, 103 S.Ct. at 2335; *see* D.C.Code § 23–581(a)(1) (1981 & 1988 Supp.).[11] Accordingly, the trial court properly denied appellant's motion to suppress and the judgment is

*Affirmed.*

NEWMAN, Associate Judge,
dissenting:

Once again we confront the question of whether an informant's tip furnished the police with probable cause to make a warrantless arrest. We would do well to begin this inquiry by noting that although there is an established analytical framework for principled decision-making in this area of the law, "[t]he unique circumstances under which each case arises ... makes the term 'binding precedent' a misnomer." *United States v. Mason,* 450 A.2d 464, 466 (D.C. 1982); *see Illinois v. Gates,* 462 U.S. 213, 238 n. 11, 103 S.Ct. 2317, 2332 n. 11, 76 L.Ed.2d 527 (1983) ("There are so many variables in the probable-cause equation

that one determination will seldom be a useful 'precedent' for another."). The majority opinion, however, belies the complexity of the inquiry before us, and in doing so, reaches a result contrary to the fundamental protections afforded by the fourth amendment's probable cause requirement. I dissent.

### I.

First, we must revisit the facts. Officer Shields testified that on the evening of October 28, 1986, a paid police informant with whom he had worked in the past, telephoned him with information concerning a slender, six-foot black man named "Jamie." He stated that the informant told him that Jamie "usually" sold drugs, "frequently" from the corner of Mozart and Fuller Streets, N.W., and that he "does sell drugs on a daily basis."[1] The informant further stated that he had purchased cocaine from Jamie's vehicle at that location within the past *seventy-two hours.* The informant gave Officer Shields the license tag number of the *silver BMW* Jamie had been driving when he purchased the cocaine, and told him that Jamie lived in the 400 block of Columbia Road.

The next morning, Officer Shields ran a tag check and found that the BMW was registered to *someone* residing at 423 Columbia Road, N.W.[2] Shortly thereafter, Officer Shields and three other officers began a stakeout of that address. At no time during the day-long surveillance, which lasted from 9 a.m. until approximately 7

---

the strong indicia of reliability of the informant's tip, for "[i]f ... a particular informant is known for the unusual reliability of his prediction of certain types of criminal activities in the locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip." *Gates, supra,* 462 U.S. at 233, 103 S.Ct. at 2329.

**11.** The dissent appears to make a microscopic search for "hard certainties" rather than "probabilities." This is not required by existing law, *e.g., Gates, supra,* nor should it be if we are not to impede a police attempt to deal *reasonably* with urban crime.

The dissent also seems not to accept in this case the truism that "[b]ecause an informant is

right about some things, he is more probably right about other facts." *Gates, supra,* 462 U.S. at 244, 103 S.Ct. at 2335 (quoting *Spinelli, supra,* 393 U.S. at 427, 89 S.Ct. at 594 (White, J., concurring)). After noting it in passing, it appears unimpressed by the long and accurate record of this particular informant, who also had never before given unreliable information over that extended period. Police do not often have those indicia of reliability plus significant corroboration when deciding whether to make an arrest.

**1.** *But see infra,* note 9.

**2.** Officer Shields testified that he could not recall to whom the BMW was registered.

p.m., did the stakeout team see a silver BMW in the neighborhood. At about 1 p.m., Officer Shields left the team and went to pick up the informant, who he then brought back to the stakeout location. No one matching the informant's description was seen entering or leaving the residence until approximately 7 p.m., when the informant identified an individual leaving the house as Jamie [Goldston]. Goldston entered a *white Audi*, drove several blocks to the corner of Mozart and Fuller Streets, N.W., parked and then exited his car. Meanwhile, the stakeout team, which consisted of Officer Shields and the informant in one car and the other members of the team in a second car, had been following Goldston. Upon arriving at the intersection, the informant told Officer Shields that the persons standing around the area were *waiting* for Jamie, a statement to which the members of the stakeout team in the second car apparently were not privy.[3] Although the informant stated that he had purchased the drugs from Jamie as Jamie sat in his car, there is no evidence that the people allegedly waiting for Jamie approached the car; rather the testimony shows that the officers from the second car arrested Goldston as he left his car. In the search incident to arrest, the police recovered five packets of cocaine.[4]

The trial judge denied Goldston's motion to suppress the evidence on the ground that the police had probable cause to arrest him based on the informant's tip. The judge found that there was sufficient indicia of reliability to conclude that probable cause existed based on the informant's veracity and basis of knowledge, and the independent corroboration of certain facts

presented in the tip. Nevertheless, she could not "refrain from expressing [her] belief that the officer cut it a little close."

## II.

The trial court's starting point, like ours, is the "totality of circumstances" test set out in *Gates, supra,* and applied by this court in *see, e.g., Jefferson v. United States,* 476 A.2d 685, 686 (D.C.1984).[5] To determine whether an informant's tip constitutes probable cause we may consider his veracity and basis of knowledge, and other indicia of reliability at our disposal, including the corroborative efforts of the police. *Gates, supra,* 462 U.S. at 230, 233, 241–42, 103 S.Ct. at 2328, 2329, 2333–34. If one of the relevant indicia is deficient, it is not necessarily fatal to a finding of probable cause, for a strong showing of reliability in another area may cure the defect. *Id.* at 233, 103 S.Ct. at 2329. This approach "permits a balanced assessment of the relative weights of all the various indicia of reliability (*and unreliability*) attending an informant's tip...." *Id.* at 234, 103 S.Ct. at 2330 (emphasis added). Contrary to the majority's assertions, *supra* notes 9 & 11, I harbor no illusions that an informant should be infallible or that we judges deal with anything more than probabilities in a case such as this. I believe that under *Gates* we are bound to make a substantive and searching inquiry into each and every circumstance pertaining to the reliability or unreliability of a tip, and only then can we make a proper determination as to whether probable cause existed.

### A. The Veracity Criterion

The trial court concluded, and the majority agrees, that the informant's "long and

---

3. In summing up the facts leading to a denial of the motion to suppress, the trial court incorrectly stated that the "officer testified, he saw all the people *waving* at [Jamie]." (Emphasis added.)

4. Officer Shields testified that five packets were found; however, the arresting officer's statement on a police department form indicates that six packets of cocaine were taken from Goldston.

5. We have recently stated that in reviewing a trial court's decision whether to suppress evidence seized as the result of an informant's tip, the "appellate court's role is to ensure that the

trial court had a substantial basis for concluding" probable cause existed. *United States v. Johnson,* 540 A.2d 1090, 1091 n. 2 (D.C.1988) (citing *Gates, supra,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33). Our review "must afford appellee all legitimate inferences from the testimony and uncontroverted facts of the record. We must also accept the inferences drawn by the trial court from the facts presented if they are supported under any reasonable view of the evidence." *United States v. Rorie,* 518 A.2d 409, 410 (D.C.1986) (citing *United States v. Ward,* 438 A.2d 201 (D.C.1981)).

significant history of productive tips and the absence of unproductive tips, at least in the evidence," satisfies the veracity prong of the inquiry notwithstanding the fact that he is an unidentified, paid police informant who obtained his information through an *uncontrolled,* unverifiable drug purchase up to *three* days before making his call to the police.[6]

The credibility or truthfulness of paid informants has always been subject to rigorous scrutiny because they are typically drawn from the criminal milieu and have unascertainable, suspect motives for divulging their information. *See Rutledge v. United States,* 392 A.2d 1062, 1066 (D.C. 1978); *Nance v. United States,* 377 A.2d 384, 389 (D.C.1977), *overruled in part, Jefferson, supra,* 476 A.2d 686 (overruling *Nance* "to the extent" it held that corroboration of innocent details is not of significant value in determining veracity of tip). *See generally* Moylan, *Hearsay and Probable Cause: An Aquilar and Spinelli Primer,* 25 MERCER L.REV. 741, 765–73 (1974). At the suppression hearing, defense counsel's attempt to probe the credibility issue was frustrated, however, when the trial judge improperly sustained the government's objections to questions concerning the informant's standing in the community, his criminal record and whether he came from the criminal milieu. This court has consistently approved of this line of questioning to examine an informant's credibility:

> Without violating the confidences of his source, the agent surely could describe for the magistrate such things as the informer's general background, employment, personal attributes that enable him to observe and relate accurately, *position in the community, reputation with others,* personal connection with the suspect, any circumstances which suggest the probable absence of any motiva-

tion to falsify, the apparent motivation for supplying the information, *the presence or absence of a criminal record or association with known criminals,* and the like.

*Nance, supra,* 377 A.2d at 389 n. 5 (quoting *United States v. Harris,* 403 U.S. 573, 600, 91 S.Ct. 2075, 2090, 29 L.Ed.2d 723 (1971) (Harlan, J., dissenting)) (emphasis added); *see Rutledge, supra,* 392 A.2d at 1066 n. 7.

Defense counsel's questions were proper, and indeed necessary to determine whether the informant could be trusted to tell the truth, notwithstanding his track record. The trial judge erred by curtailing this line of inquiry.[7] This error was particularly damaging to Goldston in light of other indicia of unreliability present in the informant's tip. Unlike the majority, I cannot say that this error did not deprive Goldston "in a fundamental sense"; given the nature of the error it seems that we are forever foreclosed from making such a determination.

Neither am I persuaded that the informant's trustworthiness is bolstered by virtue of his alleged declaration against his penal interest, to wit, he admitted participating in an illegal drug transaction. To begin with, although facially against his penal interest, the admission clearly was not contrary to his penal interest because he has never been identified and has previously gathered information through uncontrolled purchases of drugs without being prosecuted. In addition, the informant neither showed nor gave the police the drugs he allegedly purchased, and therefore no evidence exists with which to prosecute him. Under these circumstances, there is no basis whatsoever to conclude that the informant believed his inculpatory statement could subject him to criminal liability.[8] Consequently, common sense and rea-

---

6. Officer Shields testified that he had used the informer "approximately eleven times" within the preceding year and one half, and that the information had resulted in the recovery of weapons and narcotics, and an *unspecified* number of arrests and convictions.

7. Counsel was permitted to ascertain that the informant was employed and was not a drug addict, but it was unknown whether he was a drug user or whether he had any motive to lie with respect to Goldston.

8. Contrary to the majority's assertion, I do not believe the record supports the conclusion that

son defy any characterization of his admission as a declaration against his penal interest whereby his credibility is enhanced. *See United States v. Harris*, 403 U.S. 573, 594–96, 91 S.Ct. 2075, 2087–88, 29 L.Ed.2d 723 (1971) (Harlan, J., dissenting).

Furthermore, the timeliness of an admission also reflects on the trustworthiness of a statement because of the lessened opportunity for fabrication. *Cf. Chambers v. Mississippi*, 410 U.S. 284, 300–01, 93 S.Ct. 1038, 1048–49, 35 L.Ed.2d 297 (1973) (trustworthiness of declaration against penal interest should be examined by inquiring into, *inter alia*, the extent to which the declaration is really against the declarant's interest and the time the declaration is made); *Laumer v. United States*, 409 A.2d 190, 200–02 (D.C.1979) (en banc) (setting standard for determining admissibility of declaration against penal interest). Here, the informant waited up to seventy-two hours before relaying his tip, thus casting doubt on the reliability of the information. In light of these considerations, it begs reason to suggest that the informant's trustworthiness and the tip's reliability is enhanced by virtue of his admission.

### B. The Basis of Knowledge Criterion

Personal observation or knowledge of an illegal transaction establishes the informant's basis of knowledge when the tip contains detailed, current information which supports an inference that the information was obtained in a reliable fashion. *See Rutledge, supra*, 392 A.2d at 1065 & n.

5. The basis of the informant's knowledge becomes unreliable when, as here, the tip is bereft of detail, alleges facts which are easily obtained and predicted, and relates events which are up to seventy-two hours stale.

In this case, the informant's tip alleges an illegal drug transaction, but contains no specific details of the transaction itself; for example, the day and time of the sale, the logistics of purchasing the drugs from Jamie's BMW, the type and amount of drugs involved, and their cost. Rather, the informant provided an entirely vague "description" of Jamie, Jamie's block address, a detailed description of a BMW that was never directly linked to Jamie, and information that Jamie sold drugs on a daily basis and frequently from a particular location.[9] These "details" bear little resemblance to the detailed and complete tip relied upon by the Supreme Court in *Gates, supra*, 462 U.S. 213, 103 S.Ct. 2317, and *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), to support the tip's reliability. Rather, the generality of the informant's tip casts considerable doubt on whether he had actual knowledge of the facts alleged in the tip; it is equally if not more likely that he picked the information up on the street. Under these circumstances, I cannot say that the informant's basis of knowledge supports an inference that the tip is reliable.

### C. Corroboration Criterion

Equally troubling is the informant's failure to come forward with his information

---

"the government had made no insulating promises of leniency or immunity to the Informant regarding the cocaine purchase forming the basis for the tip at issue here."

9. The Record contains the following statement made by the arresting officer:

On 10–28–86 information was obtained from a reliable source who has proved reliable numerous times in the past. It said that a B/M, 6′ 0″, slim, called "Jamie", driving a silver colored BMW *from the area of Irving and Warder NW to area of Columbia Rd. and Mozart* to distribute cocaine. It also stated it has purchased cocaine from defendant out of the vehicle in past 72 hours.

On 10–29–86 *it pointed out vehicle to Officers* who *began* surveillance in 400 blk. Columbia Rd. NW. The defendant was observed leaving

423 Columbia Rd. in a white Audi with D.C. 959–578 and drive [sic] directly to Fuller & Mozart where he was stopped. Recovered from Defendant was (*6*) packets of white powder which was field tested positive for cocaine by Officer Michelle Jones.

(Emphasis added).

The arresting officer was a stakeout team member who received information about the tip from Officer Shields. The arresting officer did not testify at the Suppression Hearing. The inconsistencies and contradictions between the arresting officer's statement and Officer Shield's testimony at the Suppression Hearing, particularly with respect to the geographic references and the spotting of the BMW at the 400 block address, are troubling indeed.

within a reasonable time soon after the transaction, particularly since this was not a controlled buy. Waiting up to three days to relay his information adversely impacted upon the reliability of the tip because it not only increased the possibility of fabrication, but also decreased the ability of the police to verify or corroborate the information. Based on our experience as judges in this matter, we can be sure that the testimony that the events occurred within the last seventy-two hours indicates that the events were more than forty-eight hours old but less then seventy-two hours old. The tip's reliability is further undermined by the police's inability to corroborate the link between the BMW and Jamie, one of the rare, "true" details provided by the informant. The police were only able to make a connection between the BMW and the Columbia Road address from which Goldston exited. Thus, contrary to the informant's tip, Goldston did not drive a BMW. While the majority styles this inconsistency as a "seeming inaccuracy," the inability to verify this aspect of Jamie's modus operandi, as reported by the informant, presents a situation significantly different from what took place in *Draper, supra,* where all the details of the tip were verified.

The majority "perceive[s] no significant distinction between *Draper,*" the benchmark case on the value of corroboration, and this case. I believe this comparison is far wide of the mark. In *Draper,* as in *Gates,* the police were able to corroborate "a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily *not* easily predicted." *Gates, supra,* 462 U.S. at 245, 103 S.Ct. at 2335 (emphasis added). Thus in *Draper,* the tip revealed that the defendant would travel from Chicago to Denver by train "either the morning of the 8th of September or the morning of the 9th of September," 358 U.S. at 309, 79 S.Ct. at 331. The informant, a paid "special employee of the Bureau of Narcotics at Denver" also gave a "detailed physical description of Draper and of the clothing he was wearing, and said that he would be carrying 'a tan zipper bag,' and that he habitual-

ly 'walked real fast.'" *Id.* (footnote omitted). As discussed *supra,* the tip in the present case was general and described mundane, easily predicted facts involving the travel routine of a citizen that spanned all of several city blocks.

Nevertheless, the majority contends that it was sufficient for corroboration purposes that the informant identified Goldston coming out of the Columbia Road residence, and that he drove directly to the location the informant had previously identified. *But see supra,* note 9. The majority believes that such corroboration cures whatever unreliability problems may exist and supports the inference that the informant is trustworthy, and that he obtained his information in a reliable fashion. I cannot agree.

While the corroboration of wholly "innocent behavior frequently will provide the basis for a showing of probable cause," *Gates, supra,* 462 U.S. at 243–44 n. 13, 103 S.Ct. at 2335 n. 13; *Jefferson, supra,* 476 A.2d at 686 (such corroboration is of "significant value"), the corroboration must raise a reasonable suspicion of illegality. *See Gates, supra,* 462 U.S. at 243–46, 103 S.Ct. at 2334–36. When viewed in conjunction with the other facts presented in the tip, no reasonable suspicion of illegality arose from Goldston's exiting the house, entering a car and driving to a location in the general neighborhood. *Compare with Draper, supra,* 358 U.S. 307, 79 S.Ct. 329 *and Gates, supra,* 462 U.S. at 243, 103 S.Ct. at 2334 (corroboration of innocent facts such as the couple's rather complex set of travel arrangements to Florida, which is "well known as a source of narcotics and other illegal drugs.").

We must also distinguish the present case from the situation where information is obtained through a controlled purchase. In the controlled purchase context, the independent, contemporaneous police observation of the informant's activities is generally deemed sufficient corroboration to establish probable cause. *See Berry v. United States,* 528 A.2d 1209, 1210 (D.C.1987); *Stewart v. United States,* 395 A.2d 3, 5–6 (D.C.1978); *Jones v. United States,* 336

A.2d 535, 537–38 (D.C.), *cert. denied,* 423 U.S. 997, 96 S.Ct. 427, 46 L.Ed.2d 372 (1975); *cf. Tyler v. United States,* 298 A.2d 224, 227–28 (D.C.1972). In a controlled purchase situation, the police take careful measures to ensure that the information is reliable. Thus, the police accompany the informant to the designated location, search him for money and drugs, give him the police funds to make the purchase, observe him enter and exit the premises, and upon his return, search him again to retrieve the drugs. *See Stewart, supra,* 395 A.2d at 4–5 & n. 1; *Jones, supra,* 336 A.2d at 537. The contemporaneous observation of the illegal activity in this manner corroborates the informant's tip and lends steadfast support for further police action. *Berry, supra,* 528 A.2d at 1210 (issuance of search warrant based on informant's tip and police officer's observation of controlled purchase upheld); *Stewart, supra,* 395 A.2d at 5–6 (issuance of search warrant upheld where informant's tip was corroborated by police observation of controlled purchase); *Jones, supra,* 336 A.2d at 537 (issuance of search warrant upheld where informant's tip was corroborated by police observation of controlled purchase). This case, however, involves an allegation of illegal activity arising from an uncontrolled purchase that was unverified, uncorroborated and carries with it too few indicia of reliability.

Furthermore, with few exceptions, the cases presented to this court on the issue of whether probable cause existed based on an informant's tip involved hot tips, where it was clear that the tip was given almost contemporaneously with the events the informant was describing, and the police were able to immediately respond to and check out the information. See *United States v. Johnson,* 540 A.2d 1090, 1090 (D.C.1988) (police arrived on scene "within fifteen seconds" of receiving broadcast of phone tip); *Offutt v. United States,* 534 A.2d 936, 937 (D.C.1987) (police arrived on scene within twenty minutes of receiving phone call); *Berry, supra,* 528 A.2d at 1210 (police sought search warrant seventy-two hours after observing a *controlled* buy); *Groves v. United States,* 504 A.2d 602, 602–03 (D.C.1986) (police responded immediately to broadcast of phone tip); *Allen v. United States,* 496 A.2d 1046, 1047, 1049 (D.C.1985) (immediate police response to phone tip).[10] Under these circumstances, the corroboration of innocent details takes on heightened significance and greater reliability because of the short time frame between the observation of the illegal event and all of its attendant innocent details, and the verification of those details by the police. Where, as in this case, the tip is dead cold, there must be other indicia reliability to support a finding of probable cause to arrest someone.[11]

*Allen, supra,* and *Jefferson, supra,* are useful examples of cases where the circumstances warranted a finding of probable cause. *Allen* involved a tip by a concerned

10. *See also Jefferson, supra,* 476 A.2d at 685 (police arrived on scene "about five minutes after receiving phone call"); *Adams v. United States,* 466 A.2d 439, 443 (D.C.1983) (upon receiving phone tip, police checked outstanding arrest warrant status and then proceeded to the location where they saw the car and individual described); *United States v. Mason,* 450 A.2d 464, 465 (D.C.1982) (police responded within two minutes after receiving radio run); *Rutledge, supra,* 392 A.2d at 1064, 1065 n. 5 (detective responded promptly to tip); *Rushing v. United States,* 381 A.2d 252, 254 (D.C.1977) (officer went to site upon hearing radio dispatch of phone tip); *Nance, supra,* 377 A.2d at 385 (police received tip and went to the described location); *Lawson v. United States,* 360 A.2d 38, 38–39 (D.C.1976) ("after receiving the radio run, the investigating officers drove promptly" to the location described in the tip).

11. Probable cause is a "practical, nontechnical conception," *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), that "turn[s] on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates, supra,* 462 U.S. at 232, 103 S.Ct. at 2329. "Probable cause exists where the 'facts and circumstances within [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' [the response of the officer was reasonable]." *Brinegar, supra,* 338 U.S. at 175–76, 69 S.Ct. at 1310–11 (quoting *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

citizen who the police officer knew "was active in her community's campaign against drugs" and whose previous calls had resulted in the seizure of illicit drugs on several occasions. *Allen, supra*, 496 A.2d at 1047–48. Her tip was sufficiently detailed: "a man wearing a pink shirt, blue jeans, and Nike tennis shoes was selling [drugs] at the corner of Fifth and O Streets. The caller had seen this man receive drugs from the passenger side of an orange Pontiac that was parked on the street, then distribute them to other persons on the sidewalk." *Id.* at 1047. The police arrived at the designated location within five minutes of receiving the call, where they saw a man fitting the tipster's description walking away from an orange Pontiac. *Id.* Under these facts, the scales tip heavily in favor of reliability: the informant was unquestionably trustworthy and her detailed tip, which the police corroborated in all of its innocent aspects within minutes of receiving the call, suggested that her information was reliable.

In *Jefferson*, the police received a tip from an informant who stated that he had observed a woman wearing a blue coat, blue pants and weighing between 140 and 150 pounds, selling drugs inside a liquor store at 12th and U Streets. *Supra*, 476 A.2d at 685, 687. The police immediately responded to the location, whereupon they identified the woman as she exited the store. Although a police informant, the tipster

> had given information on at least nine occasions, and on each of these occasions the information led to arrests and the recovery of narcotics; the detective who received the tip in this case was personally involved in four of the nine cases with this informant; [and] the detective knew that other officers in his unit considered the informant to be reliable.

*Id.* at 687. While the case for reliability is not as strong in *Jefferson* as it was in *Allen*, given the totality of circumstances,

the indicia of reliability—the detailed description of an ongoing crime immediately corroborated by the police and an informant with a record for trustworthiness—outweigh the indicia of unreliability—an informant with inherently suspect and unverifiable motives, and no verification of illegal activity. In the present case, the scales tip in favor of unreliability.

### III.

"Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability [and] [o]ne simple rule will not cover every situation." *Gates, supra*, 462 U.S. at 232, 103 S.Ct. at 2329 (quoting *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972)). Under *Gates* we must examine the *totality* of circumstances surrounding the informant's tip, and in this case there is no question that the indicia of unreliability outweighs the indicia of reliability. The tip was skeletal and limited in scope; it provided easily obtained and predictable facts; it gave information of a crime up to three days old; the police were unable to corroborate the information with respect to the BMW, a material fact; Goldston's exit from the car upon arriving at the designated location conflicted with the modus operandi predicted by the informant, who allegedly purchased his drugs from the car; and, in light of the tip's staleness, the corroboration of innocent details failed to give rise to a reasonable suspicion of illegal activity. On these facts, I find no basis whatsoever for concluding that probable cause existed to arrest Goldston and therefore, I must dissent.[12]

---

**12.** At the very least, the majority, as did the trial judge, must admit that these facts present the "doubtful" or "marginal" case where the absence of a warrant should be determinative. *United States v. Ventresca*, 380 U.S. 102, 106, 85

S.Ct. 741, 744, 13 L.Ed.2d 684 (1965) (discussing judicial preference for warrant in marginal cases); *Dorman v. United States*, 140 U.S.App. D.C. 313, 323–24, 435 F.2d 385, 395–96 (1970) ("In doubtful cases where a warrantless arrest

may be undermined by a finding of lack of
probable cause the intervening judgment of the
magistrate provides an additional weight that
may uphold the arrest.").