UNITED STATES, Appellant,

v.

Ronald L. RORIE, a/k/a Ronald L. Lomax, Appellee.

No. 86–779.

District of Columbia Court of Appeals.

Argued Oct. 1, 1986.
Decided Nov. 19, 1986.

Michael W. Farrell, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and William M. Jackson, Asst. U.S. Atty., Washington, D.C., were on brief, for appellant.

Elizabeth G. Taylor, Public Defender Service, with whom James Klein and Jennifer

P. Lyman, Public Defender Service, Washington, D.C., were on brief, for appellee.

Before NEWMAN and BELSON, Associate Judges, and PAIR, Senior Judge.

PAIR, Senior Judge:

Appellee was charged by indictment on May 23, 1984, with one count of perjury, D.C.Code § 22–2511 (1986 Supp.). The indictment alleged that appellee had falsely denied before the grand jury that he had previously given the police information regarding the identity of the slayer of Conrad Richardson. Appellee moved to suppress on Fourth, Fifth and Sixth Amendment grounds the statements he allegedly made to police and which the government intended to offer as proof of his perjury. After an evidentiary hearing, the trial court ruled that some of the alleged statements were admissible but that others had been obtained in violation of appellee's Sixth Amendment right to counsel and therefore would be suppressed. The United States then noted this appeal pursuant to D.C.Code § 23–104(a)(1) (1981),[1] as to the statements ordered suppressed.

■ Our review of the trial court's decision to suppress must afford appellee all legitimate inferences from the testimony and uncontroverted facts of record. We must also accept the inferences drawn by the trial court from the facts presented if they are supported under any reasonable view of the evidence. *United States v. Ward*, 438 A.2d 201 (D.C.App.1981). In applying this long established standard of review, we conclude that the alleged statements should not be suppressed as they were not obtained in violation of appellee's Sixth Amendment right to counsel.[2]

On the evening of February 21, 1984, Conrad Richardson was shot to death in the 6200 block of Dix Street, N.E. Detectives Joseph Schwartz, Thomas Arnold and Lorren Leadman, assigned to investigate the homicide, went first to the emergency room of D.C. General Hospital to view the victim. There they found appellee, who was being treated for a minor gunshot wound to the cheek. Detective Leadman asked appellee what had happened. Appellee replied that he had been shot at East Capitol and Benning Road. Leadman disputed this story, stating that he had been at that location for some time that evening and that no shooting took place. Detectives Schwartz and Arnold then left the hospital, and visited the scene of the homicide before proceeding to the Homicide Branch. After Schwartz and Arnold left the hospital, appellee admitted to Leadman that he was at the scene of Richardson's murder. At approximately 11:00 p.m., Detective Leadman brought appellee to the Homicide Branch to be interviewed as a witness to the murder.[3]

During the late evening of February 21, 1984, and the early morning of February 22, 1984, appellee was interviewed by Detective Schwartz. The first interview took place at about midnight and lasted approximately one-half hour. Appellee, in response to being asked by Schwartz what had happened at Dix Street, stated that he

---

1. § 23–104. **Appeals by United States and District of Columbia.**

    (a)(1) the United States or the District of Columbia may appeal an order, entered before the trial of a person charged with a criminal offense, which directs the return of seized property, suppresses evidence, or otherwise denies the prosecutor the use of evidence at trial, if the United States Attorney or the Corporation Counsel conducting the prosecution for such violation certifies to the judge who granted such motion that the appeal is not taken for purpose of delay and the evidence is a substantial proof of the charge pending against the defendant.

2. Appellee urges that this court should remand the case to the trial court for reconsideration in light of new evidence that the government prosecuted appellee for murder, knowing he was innocent, and orchestrated a Sixth Amendment violation solely to obtain the statements used as evidence of perjury. We summarily reject this nonmeritorious contention.

3. Appellee was brought to the Homicide Branch solely as a witness to the shooting; he was not handcuffed; he was not placed under arrest; and he was free to leave had he so chosen.

knew Richardson, the victim of the homicide; that he was standing near Richardson when the shooting occurred; and that he did not recognize the murderer because the murderer had a towel draped around his face and a hood over his head.

Approximately two hours later, Detective Schwartz received a different version of the shooting from another witness who related that appellee had been standing in front of Richardson when the victim was shot; that a third person had been standing next to Richardson; that there were flashes from gunshots between the three people; that appellee ran off with the second person in one direction; and that Richardson ran off in the opposite direction. Detective Schwartz, at about 5:00 a.m., confronted appellee with the fact that he had received a conflicting version of the incident from another witness, and that there was no information that the murderer or anyone else was wearing any type of disguise or concealing clothing. At this time Schwartz observed a laceration type burn on appellee's trigger finger, indicating that he had recently fired a handgun. Detective Schwartz then advised appellee of his rights,[4] and placed him under arrest for the murder of Richardson. Appellee proceeded to give a written statement to Schwartz in which he acknowledged that he had been at the shooting, described having seen the shooter's face but insisted he was unable to identify the shooter. Later that day, February 22, 1984, appellee was presented on a charge of murder. He was held on a $5,000 surety bond for two days, at which time appellee made his bond and was released.

On February 25, 1984, Schwartz was in the homicide office at about 5:40 p.m. when appellee telephoned him. He explained that he had gotten out of jail on bond, had been trying to reach Schwartz, and wanted to "point us [the police] in the right direction," though he did not want to go to court and testify.[5] Appellee identified the person who had done the shooting as Lawrence, who lived on the second floor of his building and had a brother named Gary. Later in the conversation Schwartz told appellee that he should talk to his lawyer first and should not be calling Schwartz, but appellee replied that he would rather "take care of things himself, and not to worry about his lawyer." He told Schwartz that he should talk to the "police in the area" of the shooting about Lawrence and that they would be able to tell him who Lawrence was. Appellee made clear that he had seen the shooting and recognized the shooter.

Appellee indicated that he would come down to the station and give a statement that night. He gave Schwartz his telephone number and told him to call him back after verifying with the "police who work that area" the information appellee had given him and to call if they had any further questions. Schwartz then called Detective Leadman, who in turn called appellee. Leadman later reported to Schwartz that appellee had confirmed his suspicion that the murderer was Lawrence Offut.

On March 2, 1984, Detectives Schwartz and Arnold were in the courthouse for appellee's preliminary hearing when appellee motioned for them to step outside the courtroom. He asked them whether they had checked out the information he had given them about Lawrence and again volunteered that Lawrence had a brother named Gary and that Lawrence lived on the second floor of appellee's building. Later that month, on March 26, Schwartz and Arnold met appellee while serving subpoenas in the building where he lived. Appellee approached them at the elevator and told them that the gun used in the murder had been thrown down the incinerator and

---

4. Appellee signed the advice of rights form and responded positively to each question on the form after Detective Schwartz explained every word on the card to appellee who acknowledged that he understood the rights he voluntarily waived.

5. Detective Arnold also monitored this conversation on another telephone.

that the person who was responsible was a girl who lived on the seventh floor.

The second degree murder charge against appellee was dismissed by the government prior to his preliminary hearing on March 2, 1984. On April 13, 1984, a grand jury was empanelled to investigate Lawrence Offut's responsibility for the shooting and killing of Conrad Richardson and the shooting of appellee. Appellee was called before the grand jury and asserted his Fifth Amendment privilege against self-incrimination. On May 14, 1984, upon motion of the government, the United States District Court for the District of Columbia ordered appellee to testify under a grant of immunity pursuant to 18 U.S.C. § 6002 (1982).

On May 16, 1984, appellee testified before the grand jury and made the following denials under oath. He denied having placed a telephone call to one of the detectives involved in the case while the murder charge was pending against him. He denied having any conversation with the detectives in which he identified the shooter of Richardson. He acknowledged that the detectives had contacted him at home, but denied having identified the shooter to them or that the conversation involved anything other than his telling them that he had heard nothing about the shooting. He acknowledged having met the detectives in Superior Court on March 2, 1984, prior to his preliminary hearing, but denied having given them any information about who the shooter was. He further denied having "ever given any information to any police officer in connection with this case, about who the shooter was." Finally, in response to a grand juror's question, he denied ever having spoken to detectives about the possible location of the weapon used in the shooting.

On May 23, 1984, appellee was charged by indictment with one count of perjury for

his May 16, 1984, grand jury testimony. Appellee moved to suppress the statements made to Detectives Schwartz and Leadman. A suppression hearing was held on April 14, 15, and 16, 1986. The trial court ruled that appellee's statements to the detectives were all admissible except the statements made to Detective Leadman in response to Leadman's telephone call to appellee. The court below concluded and we agree that: (1) appellee was not in custody when he made his first oral statements on the night of the shooting; (2) at the time of his arrest, appellee was given adequate *Miranda* warnings and made a knowing, intelligent, and voluntary waiver of his rights; (3) there was probable cause sufficient to warrant appellee's arrest for the murder of Richardson; and (4) appellee's right to counsel had attached when he initiated the call to Detective Schwartz on February 25, but appellee intentionally relinquished his right.[6] However, we do not concur with the trial court's determination on the Sixth Amendment issue as it pertains to appellee's conversation with Detective Leadman. We find error in the trial court's refusal to conclude that appellee's waiver in regard to Schwartz extended to his statements to Leadman.

■■■ At the onset, we reiterate that the Sixth Amendment right to assistance of counsel and the exclusionary rule that enforces this fundamental guarantee are indispensable to our system of criminal justice. "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." *United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984) (quoting Schaefer, *Federalism and State Criminal Procedure*, 70 HARV.L.REV. 1, 8 (1956)). The right to counsel is not, however, absolute. It does not attach until adversarial proceedings are

---

**6.** Although the record is unclear, it appears that the court also correctly found no Sixth Amendment violation in the statements made prior to his preliminary hearing on March 2, and in appellee's building on March 26. We agree that the motion to suppress as to these statements should be denied.

commenced, "whether by way of a formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). It is also well recognized that the right to counsel may be waived. *Brewer v. Williams*, 430 U.S. 387, 404–06, 97 S.Ct. 1232, 1242–43, 51 L.Ed.2d 424 (1977). Waiver of the Sixth Amendment right to assistance of counsel turns on the accused's "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Whether an accused has effected a valid Sixth Amendment waiver requires a showing of both "comprehension and relinquishment." *Brewer, supra*, 430 U.S. at 404, 97 S.Ct. at 1242.

■ In this jurisdiction, the government bears a heavy burden to show that an accused understands that in fact he had a right to counsel and that he intentionally relinquished or abandoned his right. *Shreeves v. United States*, 395 A.2d 774, 781 (D.C.App.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979). In assessing whether or not a waiver is valid, "the court may look to the particular facts and circumstances surrounding the case, including the experience, background, and conduct of the defendant." *Id.* Ultimately, the trial court must determine that the waiver was a "knowing, voluntary, and intelligent relinquishment" of the accused's Sixth Amendment right to counsel if statements, made out of the presence of counsel, are to be introduced into evidence at trial. *Id.*

■ In our review of a trial court's findings on a motion to suppress, the determination as to the validity of a waiver will not be disturbed if supported by substantial evidence. *Rogers v. United States*, 483 A.2d 277, 283 (D.C.App.1984). Applying the proper guidelines to the instant case, we conclude that the trial court's finding of no waiver as to appellee's statements to Leadman is unsupported by the evidence.

Our examination of the facts, as established by the record below, leaves us with no doubt that appellee's waiver of his right to counsel, recognized by the lower court as applicable only to his statements to Detective Schwartz, extended to his statements to Detective Leadman. Initially, we agree that appellee's right to counsel had attached when he made his oral statements to Schwartz on February 25 and when he later that evening[7] spoke with Leadman. Further we concur in the trial court's determination that appellee effectually waived his right as to the statements made to Schwartz. This, however, is where our concurrence ends.

The record is devoid of any evidence, other than the lone fact that the telephone call to appellee was initiated by Detective Leadman, that tends to contradict the conclusion that appellee's waiver encompassed his conversation with Leadman. In his findings regarding the admissibility of appellee's various statements, the trial judge credited Detective Schwartz's testimony, and further noted the absence of any contrary testimony. The uncontroverted evidence, therefore, was that appellee called Detective Schwartz shortly after being released on bond, told him he had been trying to reach him and "wanted to point us [the police] in the right direction," and gave him information about the identity of the shooter. In finding that appellee had waived his right to counsel as to his statements to Schwartz, the trial court took particular note of the fact that appellee, in addition to making an unsolicited call to Schwartz, "was not making incriminating statements, but was making statements designed to point the police investigation away from himself and toward a man whose first name was Lawrence." The court further found that appellee was "not a neophyte in the law"; that he had twice been advised of

---

7. The record is unclear, but at oral argument the government, upon questioning, stated that Leadman called appellee the same evening that appellee called Schwartz—February 25. This was uncontroverted.

his *Miranda* rights and executed a waiver even before he was presented; and that when Schwartz, during their conversation, specifically suggested to him "the wisdom of his talking to his lawyer," appellee "indicated that he wanted to do this himself." Moreover, the undisputed testimony was that appellee agreed to come down to the station that night to give a statement, gave Schwartz his home telephone number, and told him to call him back if there were further questions after he checked with the police who worked in the area of the shooting, and who could tell him who Lawrence was.

Despite all of these facts, the trial court refused to find that appellee's waiver in regard to Schwartz extended to his statements to Leadman shortly thereafter solely because "[t]hat conversation was initiated by the police." The court did not dispute—indeed, did not mention—the fact that appellee had told Schwartz to call back after checking with someone in Leadman's district. Nor is there any support for the finding, as appellee argues, that appellee had volunteered a willingness to talk only to Schwartz and no one else, so that Leadman was exceeding the scope of appellee's waiver. Appellee told Schwartz that he "wanted to point us [the police] in the right direction." His endeavor in seeking out the detectives "to point the police investigation away from himself" was dependent upon persuading any detective involved in the investigation, and who might have questions, of his good faith and the truth of his information.

Appellee did not testify at the hearing, so the record is barren of evidence that he had changed his mind or indicated in any way to Leadman that he was reasserting the Sixth Amendment right he had previously waived. Appellee did fail to come to the station and give a formal statement, as he had promised, but this was consistent with his stated desire to aid the investigation but not "get involved." Moreover, although there is no evidence that Leadman repeated Schwartz's caution to appellee about speaking without his attorney's knowledge, there is likewise nothing suggesting that appellee's response to Schwartz—that he would rather take care of things himself—did not continue to dictate his actions in speaking to Leadman. Appellee talked to Leadman by telephone from his home, leaving him free to terminate the conversation merely by hanging up; the fact that he did not indicates that he spoke to Leadman freely and for reasons he deemed advantageous to himself. In short, there is nothing in the record, except for the bare fact that Leadman telephoned appellee, and not vice-versa, to support a finding that appellee's waiver of his right to counsel in calling Schwartz did not extend to his followup conversation with Leadman. Appellee's subsequent encounters with Detectives Schwartz and Arnold, first in the courthouse on March 2, during which he asked if they had checked his information, and then in his apartment building on March 26, during which he volunteered additional facts about the shooting, further demonstrates that his decision to talk to Leadman was freely, knowingly, and intelligently made. On neither occasion did he show reluctance to talk to anyone other than Schwartz, nor did he indicate that Leadman's call was unwelcomed.

Moreover, although, as appellee points out, it was Schwartz whom appellee called on February 25 and whom he told to call him back if there were further questions, appellee knew from the start that other officers—including Leadman—who worked in the area of the shooting would have to confirm the information he had given Schwartz if it was to serve its purpose of "point[ing the police] in the right direction."[8] Indeed, appellee expressly told Schwartz to contact those officers. Given his obvious desire to convince the police of

8. Leadman, who appellee knew worked in the neighborhood of the shooting, had questioned him at the hospital on the night of the shooting and had brought him to the police station from the hospital.

the truth of his information (and his previous experience in dealing with police), it is unreasonable to impute to him a willingness to answer follow-up questions by Schwartz but no one else.[9] Appellee said nothing to Schwartz indicating an insistence that Schwartz alone call him back; and Schwartz himself reasonably understood appellee to mean that *"we could call him back to verify any information."* Finally, appellee never testified that the call from Leadman was unwelcomed or even unexpected. To the contrary, the only reasonable inference is that he found Leadman's call a natural consequence of the decision he had made to "take care of things himself" by providing the police with leads and encouraging them to call him with any further questions.

Our consideration of the proper factors, examined in light of the "totality of the circumstances," leaves us with no doubt that the record below refutes appellee's claim that he had restricted his decision to cooperate with the police to only Schwartz. The exculpatory interest that motivated him was inconsistent with a circumscribed waiver, and the later encounters with Schwartz and Arnold, which he initiated, confirms he sought to maintain communication with the police, not only Schwartz. Although the trial judge was careful in considering the appropriate factors in relation to appellee's statements to Schwartz, he failed to explain how they supported a contrary result in regard to his statements to Leadman. Certainly appellee understood that he had a right to consult with his counsel before electing "to take care of things himself." And his experience, coupled with his motivatio; "to point [the police] in the right direction," and express invitation to the police to check his story and call him back were unequivocal proof that his initial waiver extended to

follow-up conversations with either Schwartz or another detective more knowledgeable "about the area" in which the shooting took place.

In sum, this is not an instance where the perjury prosecution must be barred because of government misconduct amounting to a violation of appellee's Sixth Amendment right to assistance of counsel. The order suppressing appellee's statements to Detective Leadman is reversed.

*Reversed.*

---

**9.** Appellee implies that he might have established a confidential relationship with Schwartz, "with whom he had spent eight or nine hours in the Homicide Division ... and to whom he had given a written statement." But Schwartz's intermittent contact with appellee during that time, and appellee's written statement, provided no leads in the investigation and resulted only in his being arrested that night. Further, Leadman too had questioned him that night and had brought him to the police station from the hospital.