**Antonio MARTINEZ, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 85–1085.**

District of Columbia Court of Appeals.

Argued Nov. 2, 1988.

Decided Nov. 21, 1989.

Thomas B. Mason, Public Defender Service, with whom James Klein and Scott W. Howe, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., at the time the brief was filed, were on the brief, for appellee.

Before TERRY, Associate Judge, GALLAGHER, Senior Judge, and MACK, Associate Judge, Retired.[*]

TERRY, Associate Judge:

Appellant Antonio Martinez and his brother, Geremias Martinez, were tried jointly for second-degree murder while armed.[1] A jury acquitted appellant's brother of all charges, but found appellant guilty of the lesser included offense of voluntary manslaughter while armed.[2] At trial the court permitted the government, on cross-examination, to impeach appellant's credibility with a prior inconsistent statement made by him to two police detectives. Appellant contends that the impeaching statement was elicited in violation of his Sixth Amendment right to counsel and therefore should not have been admitted for any purpose, including impeachment. We hold that the court did not err in allowing the prior inconsistent statement to be admitted as impeachment evidence, and accordingly we affirm appellant's conviction.

I

A. *The Government's Evidence*

On August 6, 1981, the day Santos Berrios was killed, Antonio Martinez and his brother Geremias[3] lived in an apartment building on Mount Pleasant Street, N.W., Geremias on the fifth floor and Antonio on the third floor. The evidence showed that on many prior occasions Antonio and his brothers Geremias and Fredis, along with Santos Berrios, Oscar Plaitez, Jose Saravia (the uncle of the Martinez brothers), and others gathered in Geremias' apartment to drink beer, play records, and dance to the music. All of them had come from the same small town in El Salvador.[4] In the late afternoon of August 6 such a gather-

ing took place, and again, as on past occasions, there was dancing and beer-drinking.

Sometime during the evening, Antonio and Berrios began to dance together in a playful but rough manner. Both appeared to be drunk. The two men's bodies touched several times while they danced, and both of them started to use foul language. Saravia saw Berrios pull a knife from his sock, wrap it in something, and put it back inside his sock. Not long after that, Antonio said to Berrios, "I am not queer, I am going to kill you." Antonio said that he was going down to his apartment to get a knife, and that he would be back.

When Antonio left Geremias' apartment, Plaitez warned Berrios to go before Antonio returned. Berrios declined, saying instead, "What is that dummy going to do to me?" Having announced his intention to remain, Berrios sat down on the couch and pulled his cap over his eyes. Antonio returned about five minutes later. Shortly thereafter, Berrios screamed and uttered a Spanish word ("grosero") which means rude or uncouth. At that moment Saravia, who was seated next to Berrios on the couch, looked over and saw Antonio standing in front of Berrios. Antonio's hands were on Berrios' chest, and Berrios' hands were clutching Antonio's. Plaitez heard the scream, turned, and saw Antonio remove a knife from Berrios' chest. Then Antonio pulled Berrios' cap down over his face and said, "Old man." Berrios' shirt slowly became stained with blood.

Plaitez told Geremias that they should call an ambulance. Geremias, however, threatened Plaitez with a hammer[5] and said that they should "throw [Berrios] into the garbage." Antonio then lifted Berrios' body off the couch and dragged it through

---

[*] Judge Mack was an Associate Judge of this court at the time of argument. Her status changed to Associate Judge, Retired, on October 1, 1989.

**1.** D.C.Code §§ 22–2403, 22–3202 (1989).

**2.** D.C.Code §§ 22–2405, 22–3202 (1989).

**3.** Because the brothers share the same surname, we shall generally refer to them by their first names in the course of this opinion, particularly in our summary of the facts.

**4.** Most of the witnesses at trial, other than the police and agents of the Federal Bureau of Investigation, testified in Spanish with the aid of an interpreter. Quotations from their testimony, therefore, will normally be in the language of the interpreter, not the witnesses themselves.

**5.** There was evidence that Geremias hit Berrios on the back with a hammer after he was stabbed.

a hallway into the bedroom. Geremias and Fredis followed and watched as Antonio pushed Berrios' body head first out the bedroom window.[6] Two persons in a neighboring apartment saw the body fall to the ground. Berrios' body was later found face down next to a garbage can in the stairwell beneath Geremias' bedroom window. He was pronounced dead at the scene. A knife lay near his head.

It appeared to Plaitez that Berrios was still alive when he was dropped from the window. This testimony was corroborated by the medical examiner, Dr. Silvia Comparini, who concluded that Berrios was alive at the time his body hit the ground and that he probably survived for a few minutes after the fall. Although Berrios had received at least two stab wounds to the upper part of his chest, Dr. Comparini concluded that his death was due to a broken neck. In Dr. Comparini's opinion, however, the main stab wound would have been fatal even if Berrios had not fallen five stories.[7]

After the body was thrown from the window, Geremias and Fredis, together with Plaitez, ran out of the apartment, down the stairs, down Mount Pleasant Street, down Irving Street, and finally down 16th Street, where they hailed a taxicab. Accompanied by Plaitez, the two brothers went immediately to their sister's apartment in Silver Spring, Maryland. Antonio was not with them but followed shortly thereafter. He stayed with his sister for a few days, then fled to El Salvador. He eventually reentered the United States and was arrested in California.

### B. *The Defense Evidence*

Antonio took the stand and asserted that he had stabbed Berrios in self-defense. He testified that he and Berrios' niece, who lived in El Salvador, had been corresponding regularly and that Berrios disapproved of their relationship. On the day of the stabbing, Antonio said, he spent about a half-hour in Geremias' apartment before going downstairs to his own apartment to get a bottle of rum. When he returned with the rum,[8] he rejoined the dancing with Berrios and Plaitez. After a few minutes Berrios touched him twice on the buttocks in an offensive manner. He warned Berrios not to touch him like that again, but despite the warning, Berrios touched him a third time in the same way. Antonio reacted by hitting Berrios, whereupon the two men exchanged comments about each other's masculinity or lack thereof.

A few minutes later Antonio was sitting on the couch when he saw Berrios coming toward him with a large kitchen knife in his hand,[9] looking "very serious." As Antonio stood up, Berrios pointed the knife at him and said, "I have two for you," and called him a "very offensive" name. Hearing this, Antonio knocked the knife out of Berrios' hand. Antonio testified that as he reached down to grab it, he saw Berrios coming at him with another knife. In self-defense he stabbed Berrios with the knife he had just picked up from the floor.

Antonio testified that he sustained a cut on the hand and a stab wound to the chest as a result of his encounter with Berrios. He denied throwing Berrios' body out the window. He said that he ran from the apartment and took a bus to his sister's apartment in Silver Spring, where he stayed for two or three days before fleeing to Los Angeles, and thence to El Salvador.[10]

### C. *The Post–Arrest Statement*

On November 17, 1982, more than fifteen months after Berrios' death, a grand jury indicted Antonio and Geremias for second-

---

6. Plaitez testified that Geremias seemed to be helping Antonio push Berrios out the window, but he could not be sure of this. Another witness, Leonel Ortiz, who was not present at the time, said that Geremias later told him that Berrios fell from the window "like a mango."

7. One of the knife thrusts was so forceful that the knife pierced Berrios' breastbone, his heart, and a rib behind the heart.

8. Antonio denied bringing back a knife from his apartment.

9. This was not the knife that was later found next to Berrios' body.

10. The testimony of the other defense witnesses, most of whom were members of the Martinez family, is not pertinent to this appeal.

degree murder while armed. This was the first formal charge against Antonio in connection with this case, since he had never been arrested or otherwise placed in police custody. A "notice of arraignment" was sent to Antonio (at his Mount Pleasant Street address) and to his newly appointed attorney the following day, advising them that arraignment was scheduled for December 1, 1982. Because Antonio by that time had fled to El Salvador, however, he failed to appear for the arraignment, and the court issued a bench warrant. Antonio remained a fugitive for more than two years until he was arrested in California on December 15, 1984.

Metropolitan Police Detective Rocco Cianciotti was sent to Fresno, California, to attend Antonio's extradition hearing. Before the hearing, Cianciotti was told by Antonio's court-appointed attorney that he "would not be able to talk to him [Antonio] in Fresno." There is nothing in the record to indicate that Cianciotti violated the admonition not to talk to Antonio in Fresno.

After the extradition proceedings were concluded, Antonio was brought back to the District of Columbia on January 25, 1985, and upon his arrival he was taken to an interview room in the office of the Homicide Branch at police headquarters. He was seated at a table when Detective Cianciotti entered the room to process him, a procedure which included giving *Miranda* warnings[11] and obtaining background information. It soon became apparent to Cianciotti, however, that he would be unable to complete the processing because he was not proficient in Spanish. Cianciotti therefore left the room and enlisted the aid of Detective Daniel Villars, a native of Honduras who did speak Spanish. When Cianciotti returned, Villars was with him.

Villars read Antonio his *Miranda* rights from the front of a Form PD–47–B, a standard police form containing "the *Miranda* rights in Spanish." When Villars finished reading the front of the card, he turned it over and asked Antonio the four questions on the back. After Antonio orally respond-

ed to the four questions, Villars handed the card to Antonio and asked him to read the front and back, write out a "yes" or "no" answer to each question, and then sign the card. Antonio did as he was asked. The four questions and Antonio's verbal and written responses to each of them (here translated) were as follows:

(1) "Have your rights been read to you?" "Yes."

(2) "Do you understand your rights?" "Yes."

(3) "Do you wish to answer the questions now?" "No."

(4) "Are you willing to answer questions now, without an attorney present?" "No."

Antonio told Villars that he was not going to answer any questions on the advice of his brother's lawyer. Villars was not translating Antonio's responses verbatim for Cianciotti, but Villars did inform Cianciotti that Antonio refused to answer any questions without an attorney present because that was what his brother's lawyer had advised him to do.

Cianciotti then told Villars that they should move on to the second phase of the processing: completion of the arrest report, Form PD–163, also known as a booking form. As Cianciotti read aloud the questions from the PD–163, asking Antonio his name, address, date of birth, social security number, employment history, and names and addresses of relatives and friends, Villars translated each question into Spanish. Villars also translated Antonio's answers into English for Cianciotti, who typed them on the form.

The bottom of the PD–163 contains a blank space headed "Defendant's Version." When Cianciotti got to this part of the PD–163, he asked Villars to ask Antonio "if he wanted to tell his side of the story." When Villars asked the question, Antonio responded by refusing to answer any more questions asked by Cianciotti. Villars translated this to Cianciotti, who replied, "Fine, that is his right. He doesn't have to

---

**11.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

if he doesn't want to." Villars told Antonio what Cianciotti had said.

With the PD–163 now completed, Villars got up from his chair and began to walk toward the door. At that moment Antonio called out to Villars, saying, "Wait, I'm going to tell you what happened." Villars walked back to the table, and Antonio recounted, in narrative form without any questioning from Villars, what had happened on the night of the stabbing. Antonio told Villars that he was alone in his apartment when he heard a knock on the front door. He opened the door and saw Berrios standing there with a knife. Berrios tried to stab him with the knife, forcing him to retreat through a hallway and into his bedroom with Berrios in pursuit. Antonio told Villars that he somehow managed to take the knife away from Berrios, and, as the two of them stood near the bedroom window, he stabbed Berrios once with the knife. The next thing he knew, Berrios had fallen out the window. This statement was not recorded on the PD–163.

At trial the government sought the court's permission to introduce this statement to impeach Antonio's credibility because it was inconsistent with his testimony on direct examination. After a hearing outside the presence of the jury, the court found that Antonio's *Miranda* rights had been violated but that he had given his statement voluntarily. Having made this finding, the court ruled that it would allow the statements to be introduced into evidence, but only for the purpose of impeachment.[12] Villars then testified about the contents of the statement. In the court's final charge, the jurors were instructed that they were not to consider Antonio's statement to Villars and Cianciotti for its truth, but only as a means of evaluating the truthfulness of Antonio's trial testimony.

## II

Once a criminal suspect is indicted, he or she has a Sixth Amendment right to counsel. *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261 (1988); *United States v. Gouveia,* 467 U.S. 180, 187–188, 104 S.Ct. 2292, 2296–2298, 81 L.Ed.2d 146 (1984) (citing cases); *Woodson v. United States,* 488 A.2d 910, 912 (D.C. 1985). Because Antonio was indicted in November 1982, he unquestionably had such a right to counsel when he was interviewed by Detectives Villars and Cianciotti in January 1985. We hold that this right was violated when Cianciotti, through Villars, asked him if he wanted to tell his side of the story.

Only moments before, Antonio had invoked his right not to answer any questions in the absence of an attorney. As soon as he said this, no further questions about the stabbing should have been asked without an attorney present. *Michigan v. Mosley,* 423 U.S. 96, 103–104, 96 S.Ct. 321, 326–327, 46 L.Ed.2d 313 (1975); *Miranda v. Arizona, supra* note 11, 384 U.S. at 474, 86 S.Ct. at 1627; *Townsend v. United States,* 512 A.2d 994, 1001 (D.C.1986), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2188, 95 L.Ed.2d 843 (1987). This court has held that "routine booking questions" on the PD–163 are not interrogations for *Miranda* purposes. *Id.* at 1000. The space at the bottom of the PD–163, however, is reserved for the "defendant's version." Asking a suspect if he wants "to tell his side of the story," or any other question tending to elicit a statement, is more than a routine booking question; it is interrogation. Such interrogation may take place only when a defendant knowingly and intelligently waives his Fifth and Sixth Amendment rights and voluntarily makes a statement. *See Edwards v. Arizona,* 451 U.S. 477, 483–484, 101 S.Ct. 1880, 1884–1885, 68 L.Ed.2d 378 (1981). The government concedes that there was a Sixth Amendment violation in this case, but argues that Antonio waived his right to counsel when he decided to make a statement.

Any determination of whether Antonio knowingly and intelligently waived his

---

12. At trial Antonio testified that the detectives asked him question after question, threatening either to send him to jail for life or to deport him. He said that they talked loudly, in an angry tone of voice, while banging their fists on the table at which he was seated. On appeal, however, he does not challenge the court's finding that his statement was voluntary.

right to counsel must begin with a review of the trial court's findings. *Rogers v. United States*, 483 A.2d 277, 282 (D.C. 1984), *cert. denied*, 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985). The trial court is required to make specific factual findings on the waiver issue, *Shreeves v. United States*, 395 A.2d 774, 781 (D.C. 1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979), which may take into account the particular circumstances of the case, including the conduct of the suspect at the time the statement was made. *See Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Rogers v. United States*, *supra*, 483 A.2d at 284. In this case the trial court found that "[t]here is no question that [Antonio's] statement was not admissible under *Miranda*, because he had ... stated that he did not wish to talk to anybody and did not wish to talk [about] anything without a lawyer being present...." Indeed, as the prosecutor pointed out at trial, if the government believed that Antonio had waived his right to counsel, it probably would have sought to introduce the statement in its case in chief, rather than in rebuttal. We agree with the trial court's finding and the government's position at trial, rather than the government's position on appeal.

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, *supra*, 451 U.S. at 484, 101 S.Ct. at 1884–1885 (footnote omitted). The Supreme Court in *Edwards* "established a bright-line rule" that once a suspect invokes his or her right to counsel, the right is waived only when the defendant thereafter initiates a conversation with the police. *Solem v. Stumes*, 465 U.S. 638, 646, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984); *see Michigan v. Jackson*, 475 U.S. 625, 626,

106 S.Ct. 1404, 1405, 89 L.Ed.2d 631 (1986). Antonio informed the detectives that he did not want to answer any questions without an attorney present. Moments later, when asked by Detective Villars if he wished to tell his side of the story, Antonio said "no" —an answer that was entirely consistent with the rights he had already exercised, once orally and again in writing. Cianciotti responded, "Fine, that is his right." Villars then got up to leave the room, but Antonio asked him to wait so that he could recount his version of the stabbing incident.

Antonio's actions and words do not unequivocally indicate a waiver of his right to counsel. Given the short stretch of time in which this conversation took place, it is just as likely that Antonio's statement was a product of Villars' question rather than a reopening of a dialogue with the detectives. *See Edwards v. Arizona*, *supra*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9. Moreover the adequacy of an initial invocation of the right to counsel cannot be called into doubt merely by the suspect's later response to an impermissible question. *Smith v. Illinois*, 469 U.S. 91, 98–99, 105 S.Ct. 490, 494–495, 83 L.Ed.2d 488 (1984). Because it is far from clear that Antonio waived his right to counsel, we hold that the government has not met its burden of proof on this issue. *See Colorado v. Connelly*, 479 U.S. 157, 168–169, 107 S.Ct. 515, 522–523, 93 L.Ed.2d 473 (1986); *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *United States v. Rorie*, 518 A.2d 409, 413 (D.C.1986); *Shreeves v. United States*, *supra*, 395 A.2d at 781. We agree with the trial court that Antonio's statement was voluntary, but that he did not waive his Sixth Amendment right to counsel.[13] We must therefore decide whether it was reversible error for the trial court to allow the government to use this statement for impeachment purposes.[14]

### III

Until now this court has refrained from deciding whether a statement obtained in

---

13. These are two separate issues. *Edwards v. Arizona*, *supra*, 451 U.S. at 484, 101 S.Ct. at 1884.

14. If appellant's statement to Villars had been involuntary, then it could not be used even for impeachment. See note 16, *infra*.

violation of a defendant's Sixth Amendment right to counsel could nevertheless be introduced to impeach that defendant's testimony at trial. *See Hill v. United States,* 434 A.2d 422, 432 (D.C.1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1020, 71 L.Ed.2d 307 (1982); *cf. Ibn–Tamas v. United States,* 407 A.2d 626, 644–646 (D.C.1979). That question is squarely before us in this case. We find no direct guidance on this issue from the Supreme Court.[15] The majority of state and federal courts that have addressed it, however, are in harmony with the government's position that statements obtained in violation of a defendant's Sixth Amendment right to counsel can be introduced as impeachment evidence, just as evidence obtained in violation of the Fourth and Fifth Amendments can be introduced, and for the same reasons. *See, e.g., United States v. McManaman,* 606 F.2d 919, 924–925 (10th Cir.1979); *People v. Jacobs,* 181 Cal.App.3d 916, 226 Cal.Rptr. 786, 788–789 (1986), *transferred for reconsideration,* —— Cal.3d ——, 246 Cal.Rptr. 672, 753 P.2d 627 (1988); *People v. Bacino,* 41 Ill.App.3d 738, 739, 354 N.E.2d 641, 642 (1976); *State v. Thomas,* 698 S.W.2d 942, 947–949 (Mo.Ct.App.1985); *State v. Swallow,* 405 N.W.2d 29, 39–41 (S.D.1987); *cf. United States v. Frank,* 520 F.2d 1287, 1291 (2d Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). Each of these cases relied on one or more of three Supreme Court decisions: *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), the seminal case on the subject of impeachment with illegally obtained evidence, and its two main progeny, *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). A smaller number of courts have taken the approach urged on us by appellant, namely, that cases such as

this ought to be analyzed under a separate set of Sixth Amendment principles, which will almost always result in suppression. *See, e.g., United States v. Brown,* 699 F.2d 585, 588–591 (2d Cir.1983); *People v. Gonyea,* 421 Mich. 462, 477–483, 365 N.W.2d 136, 143–145 (1984); *People v. Lucas,* 53 N.Y.2d 678, 439 N.Y.S.2d 99, 421 N.E.2d 494 (1981). We find the government's argument more persuasive, and hence we adopt the majority rule.

It is well established that the government cannot obtain a conviction by introducing as substantive evidence in its case in chief either (1) physical evidence obtained in an unlawful search and seizure, in violation of the Fourth Amendment, *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), (2) statements made by a suspect before he has been advised of his Fifth Amendment right to counsel and his right against self-incrimination, *Harris v. New York, supra,* 401 U.S. at 224, 91 S.Ct. at 645, or (3) inculpatory statements illegally elicited after *Miranda* warnings are given and the Fifth Amendment right to counsel is validly invoked, *Edwards v. Arizona, supra,* 451 U.S. at 487, 101 S.Ct. at 1886. Under proper circumstances, however, evidence in any of these three categories may be admitted to impeach the credibility of a defendant who takes the stand in his or her own defense. *See Walder v. United States, supra,* 347 U.S. at 65–66, 74 S.Ct. at 356 (Fourth Amendment); *Harris v. New York, supra,* 401 U.S. at 226, 91 S.Ct. at 646 (Fifth Amendment, incomplete *Miranda* warnings); *Oregon v. Hass, supra,* 420 U.S. at 723, 95 S.Ct. at 1221 (Fifth Amendment, *Miranda* warnings but no waiver).

The conclusion that illegally obtained evidence may sometimes be used for impeachment is neither self-evident from the language of the Fourth and Fifth Amend-

---

**15.** A few years ago the Court denied certiorari in a case presenting this very question. *See Lucas v. New York,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). Justice White, dissenting from the denial of certiorari, noted that the New York state courts were in disagreement with two circuits, one of which was the Second (which includes New York), and urged his colleagues to resolve the conflict. *Id.* at 912, 106

S.Ct. at 282. More recently, the Court granted certiorari in *Michigan v. Harvey,* —— U.S. ——, 109 S.Ct. 1117, 103 L.Ed.2d 180 (1989). We have found no reported decision from the Michigan courts in the *Harvey* case, but a brief description of the case in the United States Law Week indicates that it raises the same issue. *See Michigan v. Harvey,* 58 U.S.L.W. 3041 (1989).

ments nor intuitively obvious. Rather, the courts have reached it after a "cautious balancing" of "two competing policies of the law":

> (1) the policy that proscribes, as a prophylactic measure, the use of evidence obtained in violation of a rule of law, and (2) the policy which demands truth from witnesses in the judicial process and which regards an adversary judicial proceeding as a search for truth.

*Tate v. United States*, 109 U.S.App.D.C. 13, 15, 283 F.2d 377, 379 (1960). Without such case-by-case balancing, a defendant would invariably be given "a shield against contradiction of his own untruths"—a shield which would allow him "affirmatively [to] resort to perjurious testimony in reliance on the Government's disability to challenge his credibility" with illegally seized evidence. *Walder v. United States, supra*, 347 U.S. at 65, 74 S.Ct. at 356 (footnote omitted). Likewise, "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances," even though such utterances were obtained in violation of the defendant's Fifth Amendment rights. *Harris v. New York, supra*, 401 U.S. at 226, 91 S.Ct. at 646; *accord, Oregon v. Hass, supra*, 420 U.S. at 723, 95 S.Ct. at 1221 ("inadmissibility [for impeachment purposes] would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth").

 Nevertheless, there are instances in which illegally obtained evidence cannot be admitted for any purpose. Statements are inadmissible even for impeachment if they are the product of gross abuse, coercion, or duress. *See, e.g., New Jersey v. Portash*, 440 U.S. 450, 459–460, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979); *Mincey v. Arizona*, 437 U.S. 385, 401–402, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978). In such circumstances, the exclusionary rule serves to deter future violations of the Constitution. *See Colorado v. Connelly, supra*, 479 U.S. at 166, 107 S.Ct. at 521; *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). Using those types of cases as examples, appellant urges us to adopt a rigid rule that would treat statements taken in violation of the Sixth Amendment in the same way that involuntary statements are treated—as inadmissible for all purposes, even impeachment.[16] Although the Supreme Court has not addressed this argument directly, the Court's analysis in comparable Fourth and Fifth Amendment cases strongly suggests that it would not withstand Supreme Court scrutiny.

*Miranda* warnings sufficient to advise a pre-indictment suspect of his or her Fifth Amendment right to counsel are also adequate to make a post-indictment defendant aware of the corresponding Sixth Amendment right to counsel.

> The fact that [the defendant's] Sixth Amendment right came into existence with his indictment, *i.e.*, that he had such a right at the time of his questioning, does not distinguish him from the preindictment interrogatee whose right to counsel is in existence and available for his exercise while he is questioned.

*Patterson v. Illinois, supra*, 108 S.Ct. at 2394. It is no more difficult to waive a

---

16. Appellant relies heavily on *New Jersey v. Portash* and *Mincey v. Arizona* to support this argument. We find those cases readily distinguishable because they both involved statements which the Court held were coerced.

In *Portash* the statements which the prosecution sought to use for impeachment were statements previously made to a grand jury under a grant of immunity. The Court held that they could not be used to impeach the declarant in a subsequent trial because his prior testimony, given only after the grant of immunity, was clearly involuntary and "the essence of coerced testimony." 440 U.S. at 459, 99 S.Ct. at 1297.

In *Mincey* the state impeached the defendant's testimony at trial with statements elicited by a police officer while the defendant was hospitalized in a "debilitated and helpless condition" after being shot. 437 U.S. at 399, 98 S.Ct. at 2417. Despite *Mincey's* repeated requests for a lawyer, the officer relentlessly and continuously interrogated him, waiting until he regained consciousness to ask him more questions. On these facts the Court held that *Mincey's* statements could not be used even to impeach him because they were involuntary, not " 'the product of his free and rational choice.' " *Id.* at 401, 98 S.Ct. at 2418 (citation omitted).

Sixth Amendment right to counsel than a Fifth Amendment right, once invoked, because the Sixth Amendment right is neither "superior" to nor "greater" than the Fifth Amendment right, although different "policies" may inform certain other aspects of the two. *Id.* at 2397; *see also Ibn–Tamas v. United States, supra,* 407 A.2d at 641–642; *United States v. Yunis,* 273 U.S.App. D.C. 290, 303–304, 859 F.2d 953, 966–967 (1988). Since the Fifth and Sixth Amendment rights to counsel are the same for purposes of *Miranda* and waiver, the ultimate question is whether the policy of seeking truth in judicial proceedings applies equally and with the same vigor to a violation of the Sixth Amendment right as it does to a violation of the Fifth Amendment right, or whether the truth-seeking policy is totally irrelevant in cases like the one at bar.

## IV

The Sixth Amendment right to counsel is different from the Fifth Amendment right in that "the 'core purpose' of the [Sixth Amendment] counsel guarantee is to assure aid at trial, 'when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor,'" *United States v. Gouveia, supra,* 467 U.S. at 188–189, 104 S.Ct. at 2297–2298 (citation omitted), although the Sixth Amendment right is by no means limited to formal trial-like proceedings. *See Michigan v. Jackson, supra,* 475 U.S. at 633, 106 S.Ct. at 1410. The Sixth Amendment right attaches after indictment because it is then that a defendant becomes "immersed in the intricacies of substantive and procedural criminal law." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), quoted in *United States v. Gouveia, supra,* 467 U.S. at 189, 104 S.Ct.

at 2298. But even during the trial itself, there can be times when the trial's truth-seeking function outweighs a criminal defendant's right to the assistance of counsel. *See Perry v. Leeke,* —— U.S. ——, 109 S.Ct. 594, 600–601, 102 L.Ed.2d 624 (1989).

No one doubts that "the Sixth Amendment right to assistance of counsel and the exclusionary rule that enforces this fundamental guarantee are indispensable to our system of criminal justice," in part because the ability to exercise other rights is largely dependent on the right to have the assistance of a lawyer. *United States v. Rorie, supra,* 518 A.2d at 412. Nevertheless, we have held that it was not contrary to the Sixth Amendment for the government to impeach a defendant at a second trial with testimony she gave at a prior trial in which she had been ineffectively represented by counsel. *Ibn–Tamas v. United States, supra,* 407 A.2d at 641–646. We concluded that "the Supreme Court has given a green light to the government's use of unlawfully obtained prior inconsistent statements for impeachment purposes, as long as the other constitutional standards and common law rules of evidence are met." *Id.* at 646. In other words, even though a statement may have been obtained in violation of the Sixth Amendment right to counsel, the prophylactic effect of excluding it must still be balanced against the truth-seeking function of a trial before determining whether an illegally obtained statement should be admitted for impeachment purposes.[17]

We now apply these principles to appellant's case.

## V

Although appellant's Sixth Amendment right to an attorney had attached at the time the detectives asked him if he wished to tell his side of the story, there is no

---

17. On this point appellant seeks support in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *Massiah* is distinguishable, however, because the government there introduced an illegally obtained statement substantively in its case in chief, rather than in rebuttal for the limited purpose of impeachment, as in this case. Moreover, in *Massiah* the incriminating statement was elicited by a co-defendant who, unknown to the defendant, was

working as an agent of the government. *Id.* at 202–203, 84 S.Ct. at 1200–1201; *see also United States v. Henry,* 447 U.S. 264, 270–275, 100 S.Ct. 2183, 2186–2189, 65 L.Ed.2d 115 (1980); *United States v. Sampol,* 204 U.S.App.D.C. 349, 368–370, 636 F.2d 621, 640–642 (1980). Here no such deception was involved; appellant was well aware that the question which led to his making a statement was being asked by police officers.

evidence that he had retained a lawyer or that one had been appointed for him.[18] *Compare Oregon v. Hass, supra,* 420 U.S. at 715–716, 722–724, 95 S.Ct. at 1217–1218, 1220–1222 (although defendant had requested an attorney, one had not been appointed or retained when he made incriminating statements; statements could be used for impeachment), *with Bishop v. Rose,* 701 F.2d 1150, 1157 (6th Cir.1983) (statements written down at the express request of defendant's retained attorney could not be used for impeachment). Further, it is significant that appellant's statement was exculpatory, not inculpatory.[19]

Appellant's statement to Detective Villars and his trial testimony were consistent as to the reason why he stabbed Berrios: in both instances he claimed to have acted in self-defense after Berrios lunged at him with a knife. The inconsistency arose in appellant's description of the scene of the stabbing. In court he said that the stabbing occurred in Geremias' apartment with others present, but he earlier told Villars that the incident took place in his apartment when he was alone. Because both statements were exculpatory and supported his claim of self-defense, the admission of the prior statement did not interfere with his theory of defense; the inconsistencies between the testimony and the prior statement merely gave the jury a means of assessing his credibility. Since the credibility of witnesses is a very important factor in the jury's search for truth, impeachment by a prior inconsistent statement, even one illegally obtained, aids the jury in its truth-seeking function. *See United States v. Havens,* 446 U.S. 620, 626–628, 100 S.Ct. 1912, 1916–1917, 64 L.Ed.2d 559 (1980); *Hawthorne v. United States,* 504 A.2d 580, 591 (D.C.) ("any unchecked lie is likely to

enhance a witness' credibility" (citations omitted)), *cert. denied,* 479 U.S. 992, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986).

As we have said, balanced against the long-standing tradition of using the adversary process and the jury system as truth-seeking mechanisms is the competing policy of deterring future police misconduct. Admittedly, a police officer may have little to lose and something to gain by questioning a defendant who has invoked his Sixth Amendment right to counsel. We are convinced, however, that as in Fifth Amendment cases, the balance must be struck in favor of admitting impeachment material obtained by such questioning unless the statement was obtained by use of abusive tactics, coercion, or duress. If statements are obtained by abusive or coercive measures, then the exclusionary rule and its twin supports—the usual standards for judging the voluntariness and trustworthiness of statements—will be available to take care of the matter. The questioning of this appellant is far removed from the egregious and overbearing police conduct warranting suppression of statements in other cases. *E.g., Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

When appellant was processed, the detectives asked one, and only one, impermissible question. It was a short one, the last in a series of questions on a form that contained mostly routine booking questions which we previously held did not amount to interrogation within the meaning of *Miranda.* When appellant refused to answer, he was told that this was his right. The interview then stopped, and the detective who asked the question began to leave the room. As in *Oregon v. Hass, supra,* "the

---

**18.** Counsel was appointed to represent appellant at the extradition hearing in California, but it does not appear that this representation continued after appellant was returned to the District of Columbia. Appellant told the detectives that his brother's attorney had "advised" him not to answer questions. He does not assert, however, that he had retained his brother's lawyer to represent him either at the time the advice was rendered or at the time he was questioned. Thus we assume, for the purposes of this appeal,

that appellant was not in fact represented by counsel when he made his statement.

**19.** In two cases that are most favorable to appellant's position, the courts were dealing with inculpatory statements, in one instance a "damaging" inculpatory statement. *See People v. Gonyea, supra,* 421 Mich. at 464–465, 365 N.W.2d at 137; *People v. Lucas, supra,* 53 N.Y.2d at 679–680, 439 N.Y.S.2d at 100–101, 421 N.E.2d at 495–496.

pressure on [appellant] was no greater than that on any person in like custody or under inquiry by any investigating officer." 420 U.S. at 722–723, 95 S.Ct. at 1220–1221. Even appellant does not contend that his statement to Detective Villars was involuntary or the product of abusive tactics. See note 12, *supra.*

■ The exclusionary rule serves the valid and useful purpose of preventing, but not repairing, police conduct that results in a constitutional violation. *See Michigan v. Tucker,* 417 U.S. 433, 446, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974); *United States v. Calandra, supra,* 414 U.S. at 347, 94 S.Ct. at 619. Police officers, being human, do make mistakes, and evidence obtained through a good-faith mistake, as opposed to abusive or willful misconduct, should be admitted if some other valid and useful purpose is, on balance, better served. The reliability of a jury verdict is such a purpose. In this case we conclude that the truth-seeking function was better served by the introduction of the exculpatory statement than the deterrent function would have been by its exclusion. The detectives made a mistake in trying to complete the booking form by asking the final question, but suppression of the product of their mistake could not repair the violation of appellant's right to counsel, whereas its introduction as impeachment evidence could at least assist the jury in judging Antonio's credibility once he decided to testify in his own behalf.

We therefore hold, on the authority of *Walder v. United States, Harris v. New York,* and *Oregon v. Hass,* that a voluntary statement obtained in violation of a defendant's Sixth Amendment right to counsel may be used at trial to impeach the contrary or inconsistent testimony of that defendant.

*Affirmed.*

MACK, Associate Judge, Retired, dissenting:

I would apply the holding of the Second Circuit in *United States v. Brown,* 699 F.2d 585, 588–591 (2d Cir.1983), and reverse appellant's conviction on the ground that his statement was erroneously admitted to impeach his testimony, in violation of his Sixth Amendment right to counsel.